STEVEN G. KALAR
Federal Public Defender
Northern District of California
JENYA PARKMAN
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile:  (415) 436-7706
Email:      Jenya_Parkman@fd.org


Counsel for Defendant Shumpert

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 18–00582 VC |
| Plaintiff, | **MOTION FOR MODIFICATION OF IMPOSED TERM OF IMPRISONMENT (COMPASSIONATE RELEASE)** |
| v. | |
| RANDALL ELIJAH SHUMPERT, | **Court:**         Courtroom 4, 17th Floor |
| Defendant. | **Hearing Date:** January 5, 2021 |
| | **Hearing Time:** 10:30 a.m. |

# TABLE OF CONTENTS

NOTICE ................................................................................................................ 1

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    I.     COVID-19 is devastating the federal prison population. ...............................2

    II.    Mr. Shumpert is vulnerable to severe illness and death from COVID-19......3

        A.    Severe obesity and history of smoking. .................................................4

        B.    Hypertension, high cholesterol, age, and race......................................4

    III.   Mr. Shumpert's background and conviction......................................................5

    IV.   Mr. Shumpert's incarceration.........................................................................6

        A.    Battling COVID-19 at Santa Rita County Jail. ...................................6

        B.    45-day quarantine at USP Atwater. ......................................................7

        C.    High risk for reinfection at FCI Lompoc. .............................................8

    V.    Mr. Shumpert's release plan.........................................................................12

ARGUMENT ...................................................................................................... 14

    I.     On December 25, 2020, thirty days will have lapsed since
        Mr. Shumpert's request for compassionate release to Lompoc's warden. ....14

    II.    Extraordinary and compelling reasons warrant Mr. Shumpert's
        compassionate release....................................................................................14

    III.   Sentencing factors support granting Mr. Shumpert compassionate
        release............................................................................................................16

        A.    The nature and circumstances of the offense and the history and
            characteristics of the defendant...................................................16

        B.    The need for the sentence imposed. .....................................................17

        C.    Kinds of sentences available. ...............................................................19

        D.    Need to avoid unwarranted sentence disparities.................................19

        E.    Need to provide restitution. .................................................................21

CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

**Federal Cases**

*United States v. Belanger,*
  2020 WL 5351028 (D. Me. Sept. 4, 2020) ...................................................... 16

*United States v. Bilyou,*
  2020 WL 7138644 (S.D. Ind. Dec. 7, 2020) .................................................. 14

*United States v. Brooker,*
  976 F.3d 228 (2d Cir. 2020) ........................................................................... 13

*United States v. Bucci,*
  409 F. Supp. 3d 1 (D. Mass. 2019) ............................................................... 16

*United States v. Burrill,*
  445 F. Supp. 3d 22 (N.D. Cal. 2020) ............................................................ 20

*United States v. Connell,*
  2020 WL 2315858 (N.D. Cal. May 8, 2020) .................................................. 16

*United States v. Dunlap,*
  2020 WL 5231359 (D.D.C. Sept. 2, 2020) .................................................... 17

*United States v. Fabris,*
  2020 WL 3481708 (N.D. Cal. June 25, 2020) ......................................... 13, 20

*United States v. Fernandez,*
  2020 WL 5909490 (E.D. Cal. Oct. 6, 2020) .................................................. 16

*United States v. Fowler,*
  445 F. Supp. 3d 452 (N.D. Cal. 2020) .......................................................... 20

*United States v. Frew,*
  2020 WL 6440484 (N.D. Cal. Oct. 27, 2020) ..................................... 17, 20, 21

*United States v. Gil,*
  2020 WL 5369192 (D.N.H. Sept. 8, 2020) ............................................... 18, 21

*United States v. Grimm,*
  2020 WL 6437724 (D. Nev. Nov. 2, 2020) .................................................... 14

*United States v. Gunn,*
  980 F.3d 1178 (7th Cir. 2020) ....................................................................... 13

*United States v. Haymond,*
  139 S. Ct. 2369 (2019) ................................................................................... 19

*United States v. Hernandez,*
  2020 WL 4343991 (S.D. Fla. Apr. 3, 2020) ................................................. 16

*United States v. Indarte,*
    2020 WL 6060299 (W.D. Wash. Oct. 14, 2020) ............................................ 17

*United States v. Jackson,*
    2020 WL 3396901 (N.D. Ind. June 19, 2020) ............................................ 15

*United States v. Jacobs,*
    470 F. Supp. 3d 969 (S.D. Iowa 2020) ............................................ 18

*United States v. Jenkins,*
    460 F. Supp. 3d 1121 (D. Colo. 2020) ............................................ 15

*United States v. Jones,*
    980 F.3d 1098 (6th Cir. 2020) ............................................ 3

*United States v. Lewis,*
    2020 WL 5095471 (W.D. Wash. Aug. 28, 2020) ............................................ 14

*United States v. Little,*
    2020 WL 2613034 (N.D. Ohio May 23, 2020) ............................................ 17

*United States v. Magnuson,*
    2020 WL 7318109 (D.S.D. Dec. 11, 2020) ............................................ 14

*United States v. Mays,*
    2020 WL 7239530 (S.D. Ind. Dec. 9, 2020) ............................................ 14

*United States v. McCoy,*
    No. 20-6821, 2020 WL 7050097 (4th Cir. Dec. 2, 2020) ............................................ 13

*United States v. Perry,*
    2020 WL 7024915 (E.D. Mich. Nov. 30, 2020) ............................................ 14

*United States v. Pierce,*
    2020 WL 7406794 (D. Nev. Dec. 14, 2020) ............................................ 16, 17

*United States v. Rios,*
    2020 WL 7246440 (D. Conn. Dec. 8, 2020) ............................................ 15

*United States v. Rodriguez,*
    2020 WL 4592833 (S.D. Cal. Aug. 5, 2020) ............................................ 15

*United States v. Rupp,*
    2020 WL 7047311 (D. Nev. Nov. 30, 2020) ............................................ 15

*United States v. Schweder,*
    2020 WL 6820785 (E.D. Cal. Nov. 20, 2020) ............................................ 15

*United States v. Shivers,*
    2020 WL 7319079 (S.D. Ind. Dec. 11, 2020) ............................................ 15

*United States v. Valenzuela,*
  2020 WL 7295830 (E.D. Wash. Dec. 10, 2020) ............................................................ 15

*United States v. Williams,*
  2020 WL 7392875 (E.D. Mo. Nov. 25, 2020) .................................................................. 15

*United States v. Wooten,*
  2020 WL 6119321 (D. Conn. Oct. 16, 2020) .................................................................. 16

*United States v. Zeigler,*
  2020 WL 6481533 (N.D. Cal. Oct. 28, 2020) .................................................................. 15

**Federal Statutes**

18 U.S.C. § 3582 .................................................................................................... 1, 13, 14, 19

18 U.S.C. § 3553.................................................................................................... 17, 21, 22

## NOTICE

PLEASE TAKE NOTICE that, on January 5, 2021, at 10:30 a.m., or at a date and time convenient to this Court for a telephonic or video hearing, Randall Shumpert will and does move this Court for an order for his immediate release from custody. This motion is based on 18 U.S.C. § 3582, the attached memorandum of points and authorities, the concurrently filed declarations of Carolyn Morris-Shumpert, Noah Shumpert, Rosa Theam, Dr. Tara Vijayab, and Jenya Parkman, exhibits attendant to those declarations, and upon such evidence and argument as may be presented at the hearing.

## INTRODUCTION

Randall Shumpert, a nonviolent defendant convicted of fraud, is incarcerated in Lompoc, the site of an active COVID-19 outbreak. Mr. Shumpert has a BMI of 40.1, a history of smoking, hypertension, high cholesterol, and he is 52-years old and African-American—all risk factors for severe complications or death from COVID-19. He is especially vulnerable to contracting the disease because he is in a dorm-housing unit with about 160 other people, and in a prison notorious for failing to protect its inhabitants. If released, he would move in with his ailing, 78-year-old mother, and provide her with necessary care. He therefore presents with extraordinary and compelling reasons for release.

The sentencing factors do not require Mr. Shumpert to remain incarcerated despite showing extraordinary and compelling reasons. If not for the pandemic's effect on BOP's operations and programming, he could have been out of prison two months ago. As it is, he has served 50% of his expected custodial sentence, and done so in exceptionally harsh conditions. He spent 14 months in county custody, and was one of the first people at Santa Rita County Jail to contract COVID-19. He battled the disease for more than three-and-half weeks, and then endured medical quarantines in punitive conditions at Santa Rita, Atwater, and Lompoc. He is now outside the likely-immunity period for reinfection, and is again afraid for his life. If released, he would have access

to addiction treatment, which has not been available during his incarceration. He is unlikely to commit another financial crime, because he will be under the strict supervision of United States Probation, and will also have the support of his family. He also has a job waiting for him, which will allow him to make restitution payments.

This Court should resentence Mr. Shumpert to time served, and impose an additional term of supervised release equal to his remaining custodial sentence.

## BACKGROUND

### I.   COVID-19 is devastating the federal prison population.

The COVID-19 pandemic is surging across the country, killing more people than ever before.[1] The threat to the federal prison population remains especially high. There are currently 5,994 incarcerated people and 1,676 Bureau of Prisons (BOP) staff who are positive for COVID-19.[2] So far, 169 incarcerated people and 2 BOP staff members have died from the disease.[3] And while a vaccine may seem tantalizingly close for some, it is not for the incarcerated. Recent reporting suggests that "corrections staff [will] receive high priority for a coronavirus vaccine, but not the millions of vulnerable inmates held in U.S. facilities."[4] Dr. Tara Vijayab, a physician specializing in infectious diseases and clinical professor at UCLA medical school, estimates that a vaccine will not be available to the general public until at least summer 2021, and perhaps even later for incarcerated people.[5]

There is currently an active COVID-19 outbreak at the Lompoc prisons, where Mr.

---

[1] *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC*, CDC, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last visited December 21, 2020).
[2] *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited December 21, 2020).
[3] *Id.*
[4] Roni Caryn Rabin, *Prisons Are Covid-19 Hotbeds. When Should Inmates Get the Vaccine?*, New York Times, November 30, 2020, https://www.nytimes.com/2020/11/30/health/coronavirus-vaccine-prisons.html?action=click&module=Spotlight&pgtype=Homepage; *see also* Michael Balsamo and Michael E. Sisak, *Federal prisons to prioritize staff to receive virus vaccine*, AP News, November 23, 2020, https://apnews.com/article/coronavirus-pandemic-prisons-85361fcf7cda33c7b6afb5ad8d2df8a2.
[5] Vijayan Decl. ¶ 32.

Shumpert is incarcerated.[6] This is not Lompoc's first outbreak. This summer, nearly everyone in Lompoc prison was infected with COVID-19, and four incarcerated people died.[7] By now, whatever immunity the recovered population there had developed, is likely rapidly wearing off. Dr. Vijayab posits that any COVID-19 immunity begins to wear off 90 days after infection, and a court-appointed expert in litigation about Lompoc's pandemic response agrees with that assessment.[8] Instances of COVID-19 reinfection are well documented.[9] Some reinfected individuals suffer much more severe illness the second time around.[10] For example, the BOP recently disclosed that an incarcerated person who had recovered from COVID-19 in the summer, had tested positive again in the fall and died from the disease's complications on September 17, 2020.[11] Until a viable vaccine is widely administered, COVID-19 remains a grave threat to the lives of vulnerable incarcerated people.

## II.   Mr. Shumpert is vulnerable to severe illness and death from COVID-19.

Mr. Shumpert's medical conditions and other characteristics increase his risk of complications and death from COVID-19. His increased-risk factors are severe obesity, history of smoking, hypertension, high cholesterol, age, and race.

---

[6] *See Inmate at Lompoc Prison dies from COVID-19*, News Channel, December 16, 2020, https://keyt.com/news/top-stories/2020/12/16/inmate-at-the-lompoc-prison-dies-from-covid-19/ (noting a "current outbreak at the prison) (attached as Parkman Decl., Ex. F); *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited December 21, 2020) (reporting 21 active cases).

[7] Dave Minsky, *Nearly all inmates at Lompoc FCI tested positive for coronavirus, most asymptomatic, Lompoc Record*, July 16, 2020, https://lompocrecord.com/news/local/crime-and-courts/nearly-all-inmates-at-lompoc-fci-tested-positive-for-coronavirus-most-asymptomatic/article_f3fb06d7-f231-52b3-8f89-f21f11b73974.html; Willis Jacobson, *Inmate at Lompoc prison becomes fourth at facility to die from COVID-19*, Lompoc Record, June 5, 2020, https://lompocrecord.com/news/local/inmate-at-lompoc-prison-becomes-fourth-at-facility-to-die-from-covid-19/article_e2b03141-9b24-52a8-8c17-5d0edf1e588b.html.

[8] Vijayan Decl. ¶¶ 6,8; *See* COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters 25 ¶ 37(d) n.10, *Torres v. Milusnic*, C.D. Cal. No. 20-4450, September 25, 2020, ECF No. 101-1 (Venters Report) (attached as Parkman Decl., Ex. E) ("The CDC has reported immunity from COVID-19 reinfection as potentially limited to 90 days.").

[9] Vijayan Decl. ¶¶ 10–15.

[10] *Id.* ¶ 9.

[11] Vijayan Decl., Attachment 1.

### A.   Severe obesity and history of smoking.

Mr. Shumpert weighs 296 pounds and is six feet tall, which puts his body mass index (BMI) at 40.1 kg/m$^2$.[12] A BMI over 40 kg/m$^2$ qualifies as severe obesity, while a BMI between 30 and 40 kg/m$^2$ qualifies as obesity.[13] According to the CDC, people with obesity and severe obesity are at increased risk of severe illness from COVID-19.[14]

Mr. Shumpert also has a history of smoking cigarettes.[15] He started smoking regularly in 2013 and continued until his incarceration in 2019, at which point he smoked about half-a-pack per day.[16] According to the CDC, "[b]eing a current or former cigarette smoker increases your risk of severe illness from COVID-19."[17]

### B.   Hypertension, high cholesterol, age, and race.

Four additional factors increase Mr. Shumpert's risk of severe COVID-19 complications and death. *First*, Mr. Shumpert has high blood pressure. His blood pressure is 137 (systolic) over 85 (diastolic), which qualifies as hypertension stage one.[18] For comparison, normal blood pressure is less than 120 systolic and less than 80 diastolic.[19] According to the CDC, adults with hypertension "might be at an increased risk of severe illness from the virus that causes COVID-19."[20] *Second*, Mr. Shumpert

---

[12] Parkman Decl., Ex. B at 2 (Mr. Shumpert's weight and height); *Adult BMI Calculator*, CDC, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi /english_bmi_calculator/bmi_calculator.html (BMI corresponding to Mr. Shumpert's height and weight).

[13] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity (last visited Dec. 21, 2020).

[14] *Id.*

[15] *See* Parkman Decl. ¶ 2.

[16] *Id.*

[17] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 21, 2020).

[18] Parkman Decl., Ex. B at 2 (Mr. Shumpert's blood pressure); *see Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited December 21, 2020) (defining hypertension stage one as 130–139 systolic or 80–89 diastolic).

[19] *Id.*

[20] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions (last visited Dec. 21, 2020).

has high cholesterol (hyperlipidemia).[21] Studies have linked high cholesterol with

COVID-19 complications.[22] *Third*, Mr. Shumpert is 52 years old.[23] According to the

CDC, adults between ages 50 and 64 are four times more likely to require

hospitalization for COVID-19 than adults under age 30, and are <u>thirty</u> times more

likely to die from it.[24] *Fourth*, Mr. Shumpert is African American.[25] According to the

CDC, African Americans are 1.4 times more likely to contract COVID-19 compared to

white non-Hispanic persons, 3.7 times more likely to require hospitalization, and 2.8

times more likely to die from the disease.[26]

## III.   Mr. Shumpert's background and conviction.

Mr. Shumpert is in prison because from 2015 to 2017, he defrauded six victims of

more than half million dollars total.[27] He cultivated his victims' trust, and abused that

trust by persuading them to invest in fictitious entertainment ventures.[28] He spent the

victims' money on his gambling and cocaine addictions.[29] At the time of his June 24,

2019 arrest, Mr. Shumpert had no funds or assets, and owed $23,405 in credit-card and

other debts.[30] He quickly pleaded guilty to three counts of wire fraud, and has been in

custody since his arrest.[31]

---

[21] Parkman Decl., Ex. B at 3 (noting hyperlipidemia among Mr. Shumpert's "other medical problems).
[22] *See, e.g.*, Hao Wang, et al., *The role of high cholesterol in age-related COVID19 lethality*, July 29, 2020, https://www.biorxiv.org/content/10.1101/2020.05.09.086249v4 .full; *Understanding Cholesterol During Times of COVID-19*, QueensCare Health Centers Blog, Sept. 22, 2020, https://queenscarehealthcenters.org/2020/09/22 /understanding-cholesterol-during-times-of-covid-19/ ("There's even some evidence that increased mortality in certain COVID-19 patients is due to high cholesterol levels.").
[23] *See* Presentence Report (PSR) p. 2, ECF No. 20
[24] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html#:~:text=Age%20Increases%20Risk%20for%20Severe %20Illness&text=The%20greatest%20risk%20for%20severe,intensive%20care%2C%20o r%20a (last visited December 21, 2020).
[25] *See* PSR p. 2.
[26] COVID-19 Hospitalization and Death by Race/Ethnicity, CDC, https://www.cdc.gov /coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last visited December 21, 2020).
[27] PSR ¶¶ 6–67.
[28] *Id.*
[29] *Id.* ¶ 70, 131.
[30] *Id.* ¶ 110.
[31] *Id.* ¶¶1–4.

On February 18, 2020, this Court sentenced Mr. Shumpert to 42 months in prison, three years of supervised release, and $679,181.74 in restitution payments.[32] Mr. Shumpert's projected release date is June 16, 2022.[33] He is eligible for early release about four months before that—on February 10, 2022.[34]

## IV. Mr. Shumpert's incarceration.

During his incarceration, Mr. Shumpert has suffered through COVID-19 illness and extended medical quarantines in conditions similar to solitary confinement.[35] He spent 14 months in county custody, including 7 months post sentencing.[36] He has not had access to addiction treatment or usual programming.[37] Specifically, he has not been able to participate in BOP's intensive, nine-month Residential Drug Abuse Program (RDAP), which could have reduced his sentence by 8 to 12 months.[38] He also has not had an opportunity to accrue earned-time credits, which could have allowed him to already be out of prison.[39] Despite the difficult conditions and no access to treatment or programming, Mr. Shumpert has endured commendably, and has not incurred a single disciplinary infraction during his prison term.[40]

### A. Battling COVID-19 at Santa Rita County Jail.

Mr. Shumpert arrived at Santa Rita Jail from a federal holding facility on July 26, 2019.[41] He soon became one of the first people there to contract COVID-19.[42] After

---

[32] J., ECF No. 32.

[33] Parkman Decl., Ex. D at 1.

[34] *Id.* at 2.

[35] Parkman Decl. ¶ 2.

[36] *Id.*

[37] *Id.*

[38] *See FAQ about RDAP*, FAMM, https://famm.org/wp-content/uploads/FAQ-Residential-Drug-Abuse-Program-5.3.pdf (last visited Dec. 21, 2020) ("The average sentence reduction RDAP completers receive is 8 months."); BOP Policy Statement 5331.02 (Oct. 1, 2017) https://www.bop.gov/policy/progstat/5331.02cn.pdf (participants eligible for a 12-month reduction); Parkman Decl. ¶ 2.

[39] Parkman Decl. ¶ 2; *see First Step Act – Frequently Asked Questions*, BOP, https://www.bop.gov/inmates/fsa/faq.jsp#fsa_time_credits (last visited Dec. 21, 2020).

[40] Parkman Decl. ¶ 2.

[41] *Id.*

[42] Parkman Decl., Ex. C at 1, 5 (Mr. Shumpert started showing COVID-19 symptoms on April 3 and tested positive on April 7); *see Babu v. Ahern*, N.D. Cal. No. 18-cv-007677 NC, Order After April 2 Status Hearing Re: Santa Rita Jail COVID-19 Response 1, ECF

midnight on April 3, 2020, he sought medical assistance for breathing difficulties and a throbbing headache, and was prescribed Tylenol.[43] By that evening he felt like his head was "going to explode," was coughing, had difficulty swallowing, and needed assistance to keep himself upright.[44] On April 7, 2020, he learned that he tested positive for COVID-19.[45] For the next three-and-a-half weeks, he was isolated in a dingy cell with soiled walls and a dirty faucet.[46] He suffered from a fever and lost his senses of taste and smell.[47] He was not permitted to shower, and was denied clean clothes and bedding changes.[48] As he battled COVID-19, Mr. Shumpert was made to stew in his own sweat and sickness. He thought that he was going to die in Santa Rita Jail.[49]

When Mr. Shumpert did eventually recover from COVID-19, he was moved to another isolation unit for 14 more days.[50] After that, he was in a unit with other people who had either recovered from COVID-19 or had tested negative.[51] But in June 2020, he was moved to a new 68-person unit that housed kitchen and laundry workers.[52] By July, the virus had decimated that unit, infecting 60 of the inhabitants.[53] Because Mr. Shumpert was likely exposed to the virus during that outbreak (though he was not reinfected), Santa Rita quarantined him for more than two weeks in an 8-by-4-foot cell with one other person.[54] He was confined to that cell for 23 hours per day.[55]

### B.    45-day quarantine at USP Atwater.

In September 2020, Mr. Shumpert was designated for housing at FCI Lompoc.[56]

---

No. 91 ("On April 4, the first inmate at SRJ tested positive for COVID-19.").
[43] Parkman Decl., Ex. C at 1.
[44] *Id.*, at 2.
[45] *Id.*, at 4–5.
[46] *Id.*, at 3 ("[Mr. Shumpert] verbalized being dissatisfied with cell reporting it to be dirty [] on walls and faucet[.]"); *see* Parkman Decl. ¶ 2.
[47] Parkman Decl., Ex. B at 1.
[48] Parkman Decl. ¶ 2.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*

During the transfer, he was scheduled to stop at USP Atwater for only three days.[57] For reasons unknown to him (but likely related to the pandemic), Mr. Shumpert was detained at Atwater for more than six weeks (from September 18, 2020, until November 2, 2020).[58] He was quarantined in a cell with one other person the entire time.[59] Quarantining meant that Mr. Shumpert was confined to his cell for 24 hours per day, except for one thirty-minute shower every three days.[60] At Atwater, Mr. Shumpert was treated as though he were in punitive isolation.[61] For example, he was taken to and from the shower in handcuffs, received no hot meals, and was denied access to commissary.[62]

### C.   High risk for reinfection at FCI Lompoc.

Since November 2020, Mr. Shumpert has been housed in FCI Lompoc.[63] He was initially quarantined for two weeks in a single-person cell with the same restrictions as at Atwater.[64] Now, he is housed in a large, warehouse-style dormitory with about 160 other people.[65] Lompoc is currently experiencing yet another COVID-19 outbreak, and a person incarcerated at FCI Lompoc died from the disease just last week.[66]

Lompoc was already the site of one of the worst COVID-19 outbreaks in the country.[67] It is now the subject of a civil-rights lawsuit about its COVID-19 response. *See generally Torres v. Milusnic*, C.D. Cal. No. 20-4450. That response and the prison's

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *See Inmate at Lompoc Prison dies from COVID-19*, News Channel, December 16, 2020, https://keyt.com/news/top-stories/2020/12/16/inmate-at-the-lompoc-prison-dies-from-covid-19/ (noting a "current outbreak at the prison) (attached as Parkman Decl., Ex. F); *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited December 21, 2020) (reporting 21 active cases).
[67] *See* Dave Minsky, *Nearly all inmates at Lompoc FCI tested positive for coronavirus, most asymptomatic*, *Lompoc Record*, July 16, 2020, https://lompocrecord.com/news/local/crime-and-courts/nearly-all-inmates-at-lompoc-fci-tested-positive-for-coronavirus-most-asymptomatic/article_f3fb06d7-f231-52b3-8f89-f21f11b73974.html.

conditions of confinement are described in two independent reports: (1) a July 2020 report by the Office of the Inspector General (OIG)[68], and (2) a September 25, 2020 report by a court-appointed expert in the *Torres* litigation.[69] These reports paint a grim picture of Lompoc's management of the pandemic and its ability to prevent future outbreaks and deaths.

The OIG reported multiple failings that caused Lompoc's initial outbreak. These included medical and correctional staff shortages; delays in implementing BOP guidance; ineffective employee screening; failure to isolate infected individuals; lack of leadership; shortages in protective equipment and hygiene supplies; and insufficient use of home-confinement authority.[70] The prison's infrastructure also contributed to the spread of disease.[71] The report highlighted as "particularly concerning," the FCI's "open, dormitory style [housing], with bunk beds 3 feet apart from each other," as shown in this report photograph:[72]



---

[68] *Remote Inspection of Federal Correctional Complex Lompoc*, OIG, July 2020, https://oig.justice.gov/sites/default/files/reports/20-086_0.pdf (OIG Report).
[69] COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters, *Torres v. Milusnic*, C.D. Cal. No. 20-4450, September 25, 2020, ECF No. 101-1 (Venters Report) (attached as Parkman Decl., Ex. E).
[70] *See* OIG Report ii ("Summary of Inspection Results.").
[71] *See id.* 11 ("Lompoc's . . . infrastructure may have limited its ability to implement the CDC's social distancing guidelines.")
[72] *Id.* 12

The *Torres* expert's recent report revealed that many of the same problems continue to plague Lompoc. The author of this report, Dr. Homer Venters, previously served as the Chief Medical Officer for the New York City jail system, and his work on health and prisons has been cited by the United States Supreme Court.[73] Dr. Venters inspected Lompoc and reported that it still does not have sufficient staff to provide timely medical care; is deficient in screening detained people for COVID-19 symptoms; fails to supply necessary hygiene items; takes a punitive approach to COVID-19 quarantines; fails to take responsibility in its mortality-review assessments; and does not release eligible individuals on home confinement.[74] Dr. Venters concluded his report by emphasizing that the conditions at Lompoc and the large population of high-risk people incarcerated there "create a strong mandate for more vigorous consideration and processing of compassionate release applications."[75]

Even more disturbing than Lompoc's conditions, Dr. Venters reported deception, intimidation, and callousness by Lompoc staff. He described several Potemkin measures at the prison, including "new COVID-19 signage and general cleaning . . . reportedly done just before [his] inspection"; tape to promote social distancing in the cafeteria that "appeared to be freshly applied"; and "paper towels and soap [that] were made available in the days before [the] inspection."[76] Dr. Venters also reported "intimidation and threatening of detained people to behave in a manner prescribed by correctional staff during the inspection[.]"[77] Among the callous policies he described was the decision to provide N95 masks only to staff engaged in cleaning suspected COVID-19 contamination, even though the "strike force" the prison created for this hazardous work includes

---

[73] Homer Venters, M.D., AcademyHealth, https://www.academyhealth.org/about/people/homer-venters-md (last visited Dec. 21, 2020).
[74] *See* Venters Report 21–25 ¶ 37 ("Deficiencies in the BOP/Lompoc COVID-19 response."); *see also id.* 17–18 ¶ 34, 28 ¶ 38 (identifying concerns with Lompoc's four COVID-19 mortality reviews).
[75] *Id.* 30 ¶ 42.
[76] *Id.* 9 ¶ 20(e), 7 ¶ 17, 13 ¶ 25(g).
[77] *Id.* 25 ¶ 37(d)

incarcerated people.[78] And Dr. Venters provided an illustrative example of the prevailing attitude:

> Throughout the facilities I inspected, it was clear that people either had no access to paper towels or that access had been provided in the days before my inspection. The CDC has clearly identified the ability to dry one's hands with a single use paper towel or air dryer as critical to COVID-19 response. In one housing area I was told by BOP leadership that paper towels were not needed because of the presence of a hand dryer. I tested the hand dryer and it was broken. Staff and detained people in the unit confirmed that it had not worked for over one year. I have inspected numerous facilities that [unlike Lompoc] manage to secure paper towels for people in both dorm and cell housing areas.[79]

Lompoc staff also gave implausible answers to Dr. Venters's questions. When he asked about COVID-19 screening of incarcerated people who work in various parts of the prison, he was "told that the screenings happen without fail, but that there was no documentation."[80] When he asked about screening incarcerated people who clean the facility's intake unit, "the housing area officers did not appear to be familiar with this process and the leadership interjected to say that this screening was done without fail."[81] When he asked about measures to combat heat sensitivity in people with COVID-19 and chronic health problems, he "was told that BOP Lompoc does not experience any high heat days."[82] When he asked about timeliness of medical visits, the prison's "Clinical Director stated that he was certain that 100% of chronic care encounters occur with the prescribed timeframes based on BOP guidelines[,]" even though there were no "tracking or reporting of either chronic care or sick call timeliness."[83] Dr. Venters's observations belied the prison's deluded assertions.[84]

Lompoc is presently experiencing yet another COVID-19 outbreak. An incarcerated person from FCI Lompoc died of the disease last week.[85] And as of

---

[78] *See id.* 6 ¶ 15, 24–25 ¶ 37(c), 27 ¶ 38.
[79] *Id.* 24 ¶ 37(c).
[80] *Id.* 11 ¶ 21.
[81] *Id.* 15 ¶ 28.
[82] *Id.* 11 ¶ 21.
[83] *Id.* 16 ¶ 31.
[84] *See id.* 21–25 ¶ 37.
[85] Parkman Decl., Ex. F.

December 21, 2020, the BOP is reporting 21 active cases at Lompoc (18 incarcerated people and 3 employees).[86] At the time of Dr. Venters's report, there were only three active cases there.[87] Mr. Shumpert remains especially vulnerable. He is currently housed in a 160-person warehouse, where the inhabitants sleep three feet apart from each other.[88] Eight months post his previous bout with the illness, he is well outside the likely-immunity period.[89] There is no social distancing at FCI Lompoc, and Mr. Shumpert's unit is not regularly testing its inhabitants for COVID-19.[90]

## V.   Mr. Shumpert's release plan.

If released, Mr. Shumpert would initially move in with his mother, Mrs. Carolyn Morris-Shumpert, so that he could care for her.[91] Mrs. Morris-Shumpert is 78 years old, and lives alone in a two-bedroom, second-floor apartment in Fairfield, California.[92] She broke her ankle in November 2019, and has difficulty moving around.[93] The injury has been slow to heal, because Mrs. Morris-Shumpert also suffers from diabetes.[94] Before the pandemic, caregivers and therapists visited Mrs. Morris-Shumpert three times per week to assist her with activities of daily living and medical issues.[95] The caregivers helped her with laundry, shopping for groceries, taking out the garbage, and cleaning the apartment.[96] The therapists helped her with physical-therapy exercises for her ankle, taking baths, getting downstairs, and going on walks.[97] During the pandemic, Mrs. Morris-Shumpert has struggled without assistance.[98] Mr. Shumpert is eager to

---

[86] *See COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited December 21, 2020).
[87] Venters Report 2 ¶ 4.
[88] Parkman Decl. ¶ 2.
[89] *See id.*; *see also* Vijayan Decl. ¶¶ 6,8; Venters Report 25 ¶ 37(d) n.10.
[90] Parkman Decl. ¶ 2.
[91] *Id.*
[92] Morris-Shumpert Decl. ¶ 2.
[93] *Id.*
[94] *Id.*
[95] *Id.* ¶ 4.
[96] *Id.*
[97] *Id.*
[98] *Id.*

help his mother with all these activities.[99] Once his mother is again able to receive professional assistance, Mr. Shumpert plans to move into a separate apartment near his mother, where he would live with his partner, Rosa Theam, and their two children (ages 4 and 9).[100]

To the extent permitted by his home-confinement conditions, Mr. Shumpert is also eager to start working, so that he can make good on his restitution payments.[101] Mr. Shumpert's father has found him a job as a watchman for Chevron Corporation, which would pay $30 per hour.[102] Mr. Shumpert also has experience cleaning carpets, painting house interiors and exteriors, and working in a warehouse[103].

## LEGAL STANDARD

Under the First Step Act, this Court "may reduce [Mr. Shumpert's] term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction[.]"[104] The reduction may be granted after "the lapse of 30 days from the receipt of" Mr. Shumpert's compassionate-release request by FCI Lompoc's warden.[105] There are no other conditions constraining this Court's evaluation of Mr. Shumpert's motion, because the Sentencing Commission has not issued a policy statement governing defendant-initiated compassionate-release motions.[106]

---

[99] Parkman Decl. ¶ 2.
[100] *Id.*; *see* Theam Decl. ¶ 3.
[101] Parkman Decl. ¶ 2.
[102] *Id.*; Noah Shumpert Decl. ¶¶ 3–5.
[103] Parkman Decl. ¶ 2; Noah Shumpert Decl. ¶ 5.
[104] 18 U.S.C. § 3582(c)(1)(A).
[105] *Id.*
[106] *See United States v. Fabris*, No. 17-CR-00386-VC-2, 2020 WL 3481708, at *1 (N.D. Cal. June 25, 2020) (Chhabria, J.) (U.S.S.G. § 1B1.13 does not govern motions brought by defendants); *accord United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020); *United States v. McCoy*, No. 20-6821, 2020 WL 7050097, at *1 (4th Cir. Dec. 2, 2020); *United States v. Jones*, 980 F.3d 1098, 1102 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1181 (7th Cir. 2020).

## ARGUMENT

### I. On December 25, 2020, thirty days will have lapsed since Mr. Shumpert's request for compassionate release to Lompoc's warden.

Mr. Shumpert, through his counsel, requested compassionate release from FCI Lompoc's warden on November 25, 2020.[107] This Court may therefore reduce his sentence as of December 25, 2020, when thirty days will have lapsed since his request.[108]

### II. Extraordinary and compelling reasons warrant Mr. Shumpert's compassionate release.

Mr. Shumpert's combination of COVID-19 risk factors; his placement at Lompoc; and his mother's need for his care, are extraordinary and compelling reasons for his release.

First, Mr. Shumpert suffers from risk factors that the CDC has recognized increase his vulnerability to serious illness or death from COVID-19. These risk factors include severe obesity and a history of smoking, which the government usually concedes qualify as extraordinary and compelling reasons during this pandemic. In *United States v. Bilyou*, for example, the "United States concede[d]" that 42-year-old Mr. Bilyou, who was "obese and a former smoker," had "presented an extraordinary and compelling reason warranting a sentence reduction[.]"[109] And in *United States v. Grimm*, the "government acknowledge[d] that [the defendant's BMI, which was just over 30, was] . . . . an appropriate ground for compassionate release," even though that defendant had "never proffered her BMI as a reason for release[.]"[110] Here, Mr. Shumpert's risk factors include not only a BMI over 40 and a history of smoking, but also hypertension, high cholesterol, and being over age 50 and African American.[111] Many courts have cited these factors to satisfy the extraordinary-and-compelling standard.[112]

---

[107] Parkman Decl. ¶ 3 & Ex. A.
[108] *See* 18 U.S.C. § 3582(c)(1)(A).
[109] No. 211CR00009JMSCMM, 2020 WL 7138644, at *1–2 (S.D. Ind. Dec. 7, 2020)
[110] No. 2:08-CR-64 JCM (GWF), 2020 WL 6437724, at *1 (D. Nev. Nov. 2, 2020).
[111] *See supra* Background, Section II.
[112] *See, e.g.*, *United States v. Magnuson*, No. CR. 15-50095-JLV, 2020 WL 7318109, at

Next, Mr. Shumpert is at increased risk of contracting COVID-19 and receiving inadequate care because he is incarcerated at Lompoc. The prison is currently in the midst of yet another COVID-19 outbreak, with at least 21 active cases and a recent death.[113] The new outbreak is hardly surprising in light of Dr. Venters's report, which revealed that Lompoc can summon neither the decency nor competence to provide incarcerated people with a way to clean their hands—a simple but critical measure for containing disease spread.[114] Mr. Shumpert is especially vulnerable, because he is housed in a dorm with about 160 other people—a housing arrangement that the OIG identified as a "particularly concerning" cause of previous outbreaks.[115] Many courts have cited a person's placement in dorm housing as contributing to extraordinary and compelling reasons for compassionate release.[116] And courts have zeroed in on

---

*5 (D.S.D. Dec. 11, 2020) (factors include severe obesity and hypertension); *United States v. Valenzuela*, No. 2:11-CR-6074-WFN-1, 2020 WL 7295830, at *1 (E.D. Wash. Dec. 10, 2020) (morbid obesity and hypertension); *United States v. Rios*, No. 3:94CR112 (JBA), 2020 WL 7246440, at *3 (D. Conn. Dec. 8, 2020) (BMI of 37.2 and hypertension); *United States v. Mays*, No. 108CR00125TWPDML, 2020 WL 7239530, at *3 (S.D. Ind. Dec. 9, 2020) (factors include obesity); *United States v. Rupp*, No. 215CR00265RCJGWF, 2020 WL 7047311, at *1 (D. Nev. Nov. 30, 2020) (factors include obesity, hypertension, and high cholesterol); *United States v. Perry*, No. CR 11-20677, 2020 WL 7024915, at *3 (E.D. Mich. Nov. 30, 2020) (factors include BMI of 26.8); *United States v. Williams*, No. 4:17-CR-310-5 RLW, 2020 WL 7392875, at *1 (E.D. Mo. Nov. 25, 2020) (smoker, hypertension, African American); *United States v. Schweder*, No. 2:11-CR-0449-KJM, 2020 WL 6820785, at *1 (E.D. Cal. Nov. 20, 2020) (hypertension); *United States v. Zeigler*, No. 15-CR-00347-JST-1, 2020 WL 6481533, at *2 (N.D. Cal. Oct. 28, 2020) (obesity); *United States v. Lewis*, No. 2:10-CR-00069-RAJ, 2020 WL 5095471, at *5 (W.D. Wash. Aug. 28, 2020) (factors include being African American and 43-years-old); *United States v. Rodriguez*, No. 3:17-CR-4477-BTM, 2020 WL 4592833, at *3 (S.D. Cal. Aug. 5, 2020) (factors include obesity); *United States v. Jenkins*, 460 F. Supp. 3d 1121, 1128 (D. Colo. 2020) (factors include obesity and age between 50 and 64).
[113] *See* Inmate at Lompoc Prison dies from COVID-19, News Channel, December 16, 2020, https://keyt.com/news/top-stories/2020/12/16/inmate-at-the-lompoc-prison-dies-from-covid-19/ (attached as Parkman Decl., Ex. F); *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited December 21, 2020).
[114] See Venters Report 24 ¶ 37(c).
[115] OIG Report 12; Parkman Decl. ¶ 2.
[116] *See, e.g., United States v. Shivers*, No. 115CR00111TWPMJD2, 2020 WL 7319079, at *4 (S.D. Ind. Dec. 11, 2020) ("Mr. Shivers is assigned to a dormitory-like housing unit with 70 inmates who are assigned to bunk beds and share two urinals and three toilets. Thus, Mr. Shivers is at an increased risk of severe symptoms if he contracts COVID-19 and cannot take appropriate measures to protect himself."); *United States v. Jackson*, No. 2:18-CR-86-PPS, 2020 WL 3396901, at *6 (N.D. Ind. June 19, 2020) ("Given what has happened and continues to happen at FCI Elkton because of its open, dormitory-style in which social distancing is improbable to impossible, this situation is

conditions at FCI Lompoc as especially compelling.[117]

Finally, Mrs. Carolyn Morris-Shumpert's need for her son's care counsels in favor of release. In her declaration, Mrs. Morris-Shumpert explained the daily medical and living difficulties she has experienced during the pandemic, and how she needs her son's help.[118] Mr. Shumpert, for his part, hopes for an opportunity to help his mother.[119] Several courts have held that an elderly family member's need for care, and the incarcerated person's ability and willingness to provide that care, can justify release.[120]

## III. Sentencing factors support granting Mr. Shumpert compassionate release.

### A. The nature and circumstances of the offense and the history and characteristics of the defendant.

Mr. Shumpert committed fraud, and his crime was motivated at least in part by addictions to gambling and cocaine.[121] His offense, though reprehensible, was nonviolent. Mr. Shumpert has no history of violence or sexual misconduct of any kind, and his conduct in prison has been exemplary.[122] He presents no risk of physical danger

---

distinguishable from cases where a high-risk inmate is in a prison without a COVID-19 outbreak."); *United States v. Belanger*, No. 1:15-CR-00072-JDL, 2020 WL 5351028, at *3 (D. Me. Sept. 4, 2020) ("Belanger is residing in a dormitory environment at an institution that has been significantly affected by COVID-19 and that—as the Government observes—will, in all likelihood, continue to confirm new cases." (internal citation omitted)).

[117] *See, e.g, United States v. Pierce*, No. 313CR00052LRHWGC, 2020 WL 7406794, at *2 (D. Nev. Dec. 14, 2020) ("And the Court is concerned by the reports and the pending class action lawsuit regarding the conduct at Lompoc."); *United States v. Fernandez*, No. 2:16-CR-00115-KJM, 2020 WL 5909490, at *4 (E.D. Cal. Oct. 6, 2020) ("[D]efendant's specific risk of reinfection appears to be heightened at FCI Lompoc."); *United States v. Connell*, No. 18-CR-00281-RS-1, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020) ("FCI Lompoc, where Connell is housed, is among the worst coronavirus hotspots in the nation." (internal quotation marks omitted)).

[118] *See* Morris-Shumpert Decl. ¶¶ 1–4.

[119] Parkman Decl. ¶ 2.

[120] *See, e.g., United States v. Wooten*, No. 3:13-CR-18 (SRU), 2020 WL 6119321, at *9 (D. Conn. Oct. 16, 2020) ("Wooten's desire to care for his sister and to help Mrs. Wooten is the weightiest consideration contributing to the extraordinary and compelling reasons warranting Wooten's release in this case."); *United States v. Hernandez*, No. 16-20091-CR, 2020 WL 4343991, at *1 (S.D. Fla. Apr. 3, 2020) (releasing defendant so he could care for his ill, 84-year-old mother); *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) ("This Court rules that Mr. Bucci's role as the only potential caregiver for his ailing mother is an 'extraordinary and compelling reason' for compassionate release.").

[121] *See* PSR ¶¶ 70, 131.

[122] *See id.* ¶¶ 84–95; Parkman Decl. ¶ 2.

to anyone upon release. The risk that he would commit another financial crime would be mitigated by supervision and by Mr. Shumpert's commitments to addiction treatment, working a job, and his family.[123] Mr. Shumpert is fortunate to have the unwavering support of his mother, father, and partner—and with their help, he is determined to stay on the right path.[124] Courts have found similar circumstance to support release.[125]

## B.    The need for the sentence imposed.

Although Mr. Shumpert deserved his sentence when this Court imposed it, this factor now supports release because (1) the conditions of his incarceration have been especially harsh during the pandemic, and (2) he has not had access to rehabilitative programming.

During this pandemic, many courts have considered a defendant's served sentence on two axes—length and harshness—with the view that as conditions get harsher, prison time should decrease.[126] This Court, too, recently observed that the "conditions of confinement have been much harsher than anticipated at the time of sentencing due to the pandemic."[127] That is certainly true for Mr. Shumpert. He served 14 months of his

---

[123] *See* J. 5, ECF No. 32 ("You must provide the probation officer with access to any financial information[.]"); Parkman Decl. ¶ 2.

[124] *See* Morris-Shumpert Decl. ¶ 1; Theam Decl. ¶ 2; Noah Shumpert Decl. ¶ 2.

[125] *See, e.g., United States v. Frew*, No. 18-CR-00340-VC-1, 2020 WL 6440484, at *1 (N.D. Cal. Oct. 27, 2020) ("Nor is [fraud defendant] likely to be a danger to the community given that he his financial affairs will be closely supervised and that he will be subject to home confinement."); *Pierce*, 2020 WL 7406794, at *2 ("[Defendant] has continued family support and upon his release, a family member's home to reside in."); *United States v. Dunlap*, No. 17-CR-207 (KBJ), 2020 WL 5231359, at *4 (D.D.C. Sept. 2, 2020) (nonviolent defendant's underlying drug addiction is a mitigating factor favoring compassionate release).

[126] *See, e.g., United States v. Indarte*, No. CR17-5554 BHS, 2020 WL 6060299, at *4 (W.D. Wash. Oct. 14, 2020) ("[T]he Court finds that the factor relating to the 'need for just punishment' has dramatically shifted since sentencing. The lock-down measures prisons across the country . . . have undergone to mitigate the spread of the pandemic have made confinement much more punitive than was contemplated at sentencing."); *United States v. Little*, No. 1:18-CR-308, 2020 WL 2613034, at *2 (N.D. Ohio May 23, 2020) ("High-risk defendants living in fear during a COVID-19 outbreak in their facility experience an incarceration significantly more laborious than before COVID-19. The laborious nature of this incarceration causes the § 3553(a) factors to favor release before the defendant [h]as served his or her full sentence." (internal citations omitted)).

[127] *Frew*, 2020 WL 6440484, at *1 (Chhabria, J.).

sentence (including seven months post sentencing) in county jail, where conditions are generally worse than in federal prisons, and glaringly so during the pandemic.[128] It was in county jail (Santa Rita) that Mr. Shumpert contracted COVID-19.[129] Because he was one of the first people there to contract the virus, he suffered through illness while the jail was developing its pandemic response. Staff first dismissed his symptoms, merely prescribing him Tylenol, and then recoiled from him, unwilling to provide him new sheets or a change of clothes for more than three weeks.[130] After his recovery, Mr. Shumpert was subjected to quarantines in Santa Rita, Atwater, and Lompoc, often in punitive conditions.[131] And he remains fearful for his life in dorm housing at Lompoc.[132]

Mr. Shumpert also has not had access to valuable treatment and programming.[133] In *United States v. Gil*, the district court observed that due to "the restrictions implemented to prevent the spread of COVID-19, defendant[s] ha[ve] no access to drug treatment programming, counseling, or educational or vocational classes," and incarceration is therefore "failing to fulfill the need for [the] sentence to provide [] educational and vocational training or experience, substance abuse treatment, and mental health treatment in any manner, let alone 'in the most effective manner.'"[134] The *Gil* court recognized that released defendants, on the other hand, "would have some access, either in-person or remotely, to substance abuse treatment and mental health treatment that would help [them] continue [their] rehabilitation and sobriety."[135] That is precisely Mr. Shumpert's situation.

---

[128] *See, e.g., United States v. Jacobs*, 470 F. Supp. 3d 969, 971 (S.D. Iowa 2020) ("The [COVID-19] situation is particularly dire at county jails, some of which hold federal prisoners who have been sentenced but not yet transferred to a federal prison."); *see* Parkman Decl. ¶ 2.
[129] *See* Parkman Decl., Ex. C at 5.
[130] *See* Parkman Decl. ¶ 2 & Ex. C at 1.
[131] *Id.* ¶ 2.
[132] *Id.*
[133] *Id.*
[134] No. 19-CR-074-LM-1, 2020 WL 5369192, at *4 (D.N.H. Sept. 8, 2020) (quoting 18 U.S.C. § 3553(a)(2)(D)).
[135] *Id.*

### C.   Kinds of sentences available.

The First Step Act permits this Court to replace the unserved portion of Mr. Shumpert's original term of imprisonment with a special term of supervised release.[136] Mr. Shumpert thus requests not outright release, but that this Court impose an additional term of supervised release until June 16, 2022—his expected release date. During this additional term, this Court should impose a condition of home confinement to be monitored by technology at the discretion of the Probation Department, as well as all conditions of supervision ordered at judgment. These conditions include close monitoring of Mr. Shumpert's financial affairs, treatment for drug and alcohol abuse, participation in a mental-health-treatment program that addresses gambling addiction, and a prohibition on any form of gambling.[137] Mr. Shumpert would also remain bound by these conditions for three years after completing the special term. Therefore, granting Mr. Shumpert compassionate release would not decrease the length of his final sentence.[138]

### D.   Need to avoid unwarranted sentence disparities.

This factor supports release for two reasons: (1) Mr. Shumpert would likely already be out of prison if the pandemic had not disrupted BOP programming, and (2) defendants similarly situated to Mr. Shumpert have been granted compassionate release.

First, if not for the pandemic, Mr. Shumpert could potentially have been out of prison two months ago. He has now served 18 months of his sentence.[139] Under the First Step Act, he was eligible for earn-time credits, which could have reduced his sentence by up to 65%.[140] If the BOP had offered earn-time-credit programming during

---

[136] *See* 18 U.S.C. § 3582(c)(1)(A).
[137] *See* J. 5, Feb. 24, 2020, ECF No. 32.
[138] *See United States v. Haymond*, 139 S. Ct. 2369, 2379 (2019) ("[The] final sentence includes any supervised release sentence [the defendant] may receive.").
[139] *See* PSR ¶ 4 (in custody since June 24, 2019).
[140] *See First Step Act – Frequently Asked Questions*, BOP, https://www.bop.gov/inmates/fsa/faq.jsp#fsa_time_credits (last visited Dec. 21, 2020); *see also* Thomas R. Ascik, *'Reform' bill may reduce prisoners' time behind bars by*

the pandemic, Mr. Shumpert could therefore have reduced his sentence from 42 to 28 months. He could have further reduced his sentence from 28 to 20 months by completing RDAP.[141] And the BOP would likely have released him to a halfway house or home detention 4 months early—after he had served 16 months.[142] Therefore, if not for the pandemic, Mr. Shumpert could have been out of prison two months ago.

Second, if this Court grants Mr. Shumpert's motion, he will have served half his expected custodial sentence (even without the benefit of the programs described above).[143] During this pandemic, this Court has released medically vulnerable defendants who have served similar or smaller percentages of their sentences.[144] Courts have also released white-collar defendants responsible for much higher loss amounts than Mr. Shumpert. In *United States v. Burrill*, for example, a court in this district released a fraud defendant who owed nearly $3 million in restitution.[145] That defendant had served 13 months of his 30-month sentence.[146] And in *United States v. Frew*, this Court released a defendant who owed over $6 million in restitution to his victims —ten times what Mr. Shumpert owes.[147] This Court ordered that defendant's release from

---

*nearly 40 percent*, The Hill, May 31, 2018, https://thehill.com/opinion/criminal-justice/389933-reform-bill-may-reduce-prisoners-time-behind-bars-by-nearly-40.
[141] *See FAQ about RDAP*, FAMM, https://famm.org/wp-content/uploads/FAQ-Residential-Drug-Abuse-Program-5.3.pdf (last visited Dec. 21, 2020) ("The average sentence reduction RDAP completers receive is 8 months."); BOP Policy Statement 5331.02 (Oct. 1, 2017) https://www.bop.gov/policy/progstat/5331.02cn.pdf (participants eligible for a 12-month reduction).
[142] *See* Parkman Decl., Ex. D at 2 (showing that Mr. Shumpert is eligible for home detention four months before his projected release date).
[143] *See* Parkman Decl., Ex. D at 1.
[144] *See United States v. Fowler*, 445 F. Supp. 3d 452, 453 (N.D. Cal. 2020) (Chhabria, J.); Gov't Opp. to Comp. Release 14, N.D. Cal. No. 3-17-cr-00412-VC, June 1, 2020, ECF No. 77 (defendant had served 11 months of 60-month sentence); *see also United States v. Fabris*, No. 17-CR-00386-VC-2, 2020 WL 3481708, at *1 (N.D. Cal. June 25, 2020) (Chhabria, J.); Gov't Opp. to Comp. Release 17, N.D. Cal. No. 17-CR-00386-VC-2, June 6, 2020, ECF No. 85 (the defendant had served 18 months of 60-month sentence).
[145] 445 F. Supp. 3d 22, 24 (N.D. Cal. 2020); *see* Second Amend. J. 6, *United States v. Burrill*, N.D. Cal. No. CR-17-00491-002 RS, March 22, 2019, ECF No. 270 at 6 (ordering $2,912,303 in restitution).
[146] *See Burrill*, 445 F. Supp. 3d at 24.
[147] No. 18-CR-00340-VC-1, 2020 WL 6440484, at *1 (N.D. Cal. Oct. 27, 2020); *see* Gov't Opp. to Comp. Release 7, *United States v. Frew*, N.D. Cal. No. 18-CR-00340-VC-1, Sept. 8, 2020, ECF No. 45 ("[T]he Court ordered restitution well over $6,000,000 to be paid by Frew to his victims, a very large amount of money for a fraud perpetrated by a single

Lompoc after he had served 10 months of a 51-month sentence.[148] Mr. Shumpert's release during this pandemic would therefore cause no unwarranted sentence disparities.

### E.   Need to provide restitution.

Mr. Shumpert's release would also facilitate him making progress on the $679,181.74 he owes in restitution. Mr. Shumpert's father has found him employment that would pay $30 per hour, and Mr. Shumpert is eager to accept that job.[149] Having a "job offer awaiting" weighs in favor of his release.[150]

## CONCLUSION

This Court did not sentence Mr. Shumpert to die in prison. During this pandemic, however, the BOP and FCI Lompoc have proven unable to protect their most vulnerable charges from that grim end. This Court should therefore grant Mr. Shumpert compassionate release, and permit him to serve the remainder of his custodial sentence in home confinement.

Dated:   December 21, 2020                    Respectfully submitted,

                                             STEVEN G. KALAR
                                             Federal Public Defender
                                             Northern District of California

                                             */s/ Jenya Parkman*
                                             JENYA PARKMAN
                                             Assistant Federal Public Defender

---

individual.").
[148] *Frew*, 2020 WL 6440484, at *1.
[149] Noah Shumpert Decl. ¶ 4; Parkman Decl. ¶ 2.
[150] *Gil*, No. 19-CR-074-LM-1, 2020 WL 5369192, at *4.