DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

PATRICK K. O'BRIEN (CABN 292470)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7126
      FAX: (415) 436-7234
      Patrick.OBrien@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>RANDALL ELIJAH SHUMPERT,<br><br>     Defendant. | **CASE NO. 18-CR-00582-VC**<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE FROM CUSTODY** |

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................................................1

**BACKGROUND** .............................................................................................................1

**I.      SHUMPERT HAS ADMINISTRATIVELY EXHAUSTED** ....................................3

**II.     REDUCTION OF SHUMPERT'S SENTENCE IS NOT WARRANTED**............................3

     **A.      Applicable law** ...................................................................................4

     **B.      Shumpert's extraordinary and compelling reasons**........................................9

     **C.      This Court may not modify Shumpert's sentence because he is a danger to others**................................................................................................14

     **D.      Section 3553(a) factors weigh against his release** ..........................................18

**III.    IF THIS COURT MODIFIES SHUMPERT'S SENTENCE, IT SHOULD DO SO WITH APPROPRIATELY RESTRICTIVE CONDITIONS** .......................................20

1

## **TABLE OF AUTHORITIES**

2

**Federal Cases**

3

*Bonneau v. Salazar*, 804 F. App'x 717 (9th Cir. 2020) ......................................................... 13

4

*Dillon v. United States*, 560 U.S. 817 (2010) ...................................................................... 5, 6

5

*Reeb v. Thomas*, 636 F.3d 1224 (9th Cir. 2011) ..................................................................... 13

6

*Tapia v. United States*, 564 U.S. 319 (2011) ..................................................................... 13, 14

7

*United States v. Ayon-Nunez*, 2020 WL 704785 (E.D. Cal. Feb. 12, 2020) ........................... 9

8

*United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) ....................................................... 5, 6

9

*United States v. Burrill*, 445 F. Supp. 3d 22 (N.D. Cal. 2020) ............................................... 7

10

*United States v. Ceballos*, 671 F.3d 852 (9th Cir. 2011) ....................................................... 13

11

*United States v. Chambliss*, 948 F.3d 691 (5th Cir. 2020) ..................................................... 18

12

*United States v. Chan,* 2020 WL 1527895 (N.D. Cal. Mar. 31, 2020) .................................... 5

13

*United States v. Eberhart*, 448 F. Supp. 3d 1086 (N.D. Cal. 2020) .............................. 6, 7, 8

14

*United States v. Greenhut*, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020) ................................. 7

15

*United States v. Harris*, No. 18-20343, 2018 WL 3239624 (E.D. Mich. July 3, 2018) .............. 15, 16, 17

16

*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008) .............................................................. 18

17

*United States v. Krietzman*, 2020 WL 4368191 (N.D. Cal. July 30, 2020) ........................... 10

18

*United States v. Mangarella*, 2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) ........................ 9

19

*United States v. Nassar*, 2020 WL 6484181 (E.D. Cal. Nov. 4, 2020) ................................. 20

20

*United States v. Noel*, 2020 WL 6505039 (D. Nev. Nov. 5, 2020) ....................................... 11

21

*United States v. Pawlowski*, 967 F.3d 327 (3d Cir. 2020) ..................................................... 18

22

*United States v. Raia*, 954 F.3d 594 (3d Cir. 2020) ................................................................. 8

23

*United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) ....................................................... 15

24

*United States v. Rodriguez*, 2019 WL 6311388 (N.D. Cal. Nov. 25, 2019) ........................... 5

25

*United States v. Saldana*, 807 F. App'x 816 (10th Cir. 2020) ................................................ 6

26

*United States v. Shields*, 2019 WL 2359231 (N.D. Cal. June 4, 2019) ................................. 14

27

*United States v. Shields*, 2019 WL 2645028 (N.D. Cal. June 27, 2019) .................................. 6

28

*United States v. Spencer*, __ F. App'x __, 2020 WL 5498932 (6th Cir. Sept. 2, 2020).................... 20, 21

*United States v. Sprague*, 135 F.3d 1301 (9th Cir. 1998) ........................................................... 7

*United States v. Verderosa*, No. 17-CR-0372-9(JS), 2020 WL 6449238 (E.D.N.Y. Nov. 2, 2020) ........ 19

*United States v. Wade*, 2020 WL 3254422 (N.D. Cal. June 16, 2020).............................................. 11, 12

*United States v. Weidenhamer*, 2019 WL 6050264 (D. Ariz. Nov. 8, 2019) ......................................... 9

*United States v. Willingham*, 2019 WL 6733028 (S.D. Ga. Dec. 10 ........................................................ 6

*United States, v. Garcia*, 2020 WL 7488675 (N.D. Ind. Dec. 21, 2020)................................................ 10

**Statutes**

18 U.S.C. § 1343 ......................................................................................................................... 1

18 U.S.C. § 3142(g) ................................................................................................................ 4, 14, 15

18 U.S.C. § 3142(g)(1) ...................................................................................................................... 15

18 U.S.C. § 3553(a) .......................................................................................................................... 18

18 U.S.C. § 3582(c) ............................................................................................................................ 5

18 U.S.C. § 3582(c)(1)(A) ....................................................................................................... passim

18 U.S.C. § 3624(c) .......................................................................................................................... 13

18 U.S.C. §§ 3621(b) & 3624(c)........................................................................................................ 14

28 U.S.C. § 994(t) ...................................................................................................................... 5, 15

Pub. L. 116-136............................................................................................................................... 13

Pub. L. No. 115-391 ........................................................................................................................... 5

**Rules**

United States Sentencing Guidelines (USSG) § 1B1.13 .......................................................... passim

USSG § 1B1.13(2) ............................................................................................................................ 14

USSG § 5F1.2 ................................................................................................................................... 20

## INTRODUCTION

Defendant Randall Elijah Shumpert is currently serving a 42-month sentence for his wire fraud conviction at FCI Lompoc, with an anticipated release date of June 16, 2022. He seeks relief pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) or home confinement. Dkt. No. 35.

Shumpert's motion should be denied for two independent reasons. First, the Court may not reduce Shumpert's sentence unless it finds that he is not a danger to others. Shumpert's brazen fraud scheme in this case, his history of committing similar schemes, and his prior custodial sentences that did not stop him from defrauding new victims in this case preclude such a finding. Second, the section 3553(a) factors weigh strongly against a reduced sentence. The nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, protect the public from further crimes, and provide just punishment, all counsel against releasing Shumpert less than half-way through his sentence.

## BACKGROUND

On December 4, 2018, the grand jury in this district returned a three-count indictment charging Shumpert with wire fraud, in violation of 18 U.S.C. § 1343. Dkt. No. 1. The indictment arose from an FBI investigation revealing that Shumpert had been preying on single women for several years and manipulating them into giving him hundreds of thousands of dollars that he spent on luxury cars and trips to casinos. Lying about everything from his true name to his past, Shumpert falsely told his victims that he ran a successful entertainment business. He solicited significant amounts of money from each victim, promising to repay these "investments" in his alleged company and guaranteeing a large return. But when the date for repayment came, Shumpert peddled new lies, made false promises, and convinced his victims to give him even more money.

Shumpert stipulated to pretrial detention in this case, and it is not hard to see why he did so. In addition to the egregious fraud scheme charged in the indictment, Shumpert's conduct after he learned of his indictment reflected his lack of acceptance of responsibility for what he had done and foreclosed his ability to seek pretrial release as a practical matter. The same day the grand jury indicted Shumpert, FBI Special Agent Joel Seaton attempted to contact Shumpert at a phone number and an e-mail address

1   that investigators believed he used.  Dkt. No. 28, Declaration of FBI Special Agent Joel Seaton ("Seaton

2   Decl.") ¶ 3.  Special Agent Seaton also contacted a defense attorney who previously represented

3   Shumpert in this investigation.  *Id.*  Special Agent Seaton informed the attorney of the indictment and

4   noted that the government would allow Shumpert to self-surrender.  *Id.*  On December 6, 2018, the

5   defense attorney told Special Agent Seaton and Assistant U.S. Attorney Sailaja Paidipaty that he spoke

6   with Shumpert and informed him of the indictment, but that it was unclear whether the attorney would

7   be retained for the prosecution.  *Id.* ¶ 4.  The attorney further noted that Shumpert said he did not have a

8   reliable phone number.  *Id.*  So by December 6, 2018, Shumpert knew he was under indictment, knew

9   there was a warrant for his arrest, and failed to self-surrender.  The government followed up with the

10  defense attorney on two occasions, but never received a response.  Dkt. No. 27, Declaration of Sailaja

11  Paidipaty in Support of United States' Sentencing Memorandum ¶ 4.  Over the next six months, the FBI

12  investigated Shumpert's whereabouts, finally arresting him in Long Beach on June 24, 2019.  PSR ¶ 4.

13          On November 5, 2019, Shumpert pleaded guilty to all three counts of wire fraud charged in the

14  indictment pursuant to a plea agreement.  In the plea agreement, Shumpert admitted to defrauding no

15  fewer than six victims using the same basic fraud scheme.  *Id.* ¶ 2.  Shumpert, using a fake name, lured

16  his victims to him by lying to them about his true intentions and making them believe they were in a

17  romantic relationship.  *Id.*  Shumpert then lied about financial opportunities with phony entertainment

18  companies that did not actually exist, and used the victims' money for his own personal benefit.  *Id.*  The

19  plea agreement also included an agreed-upon adjusted offense level with a 2-level enhancement for

20  causing substantial financial hardship because more than one victim gave money to Shumpert from their

21  retirement and other savings accounts.  The plea agreement also included an undisputed loss range of

22  more than $550,000 but less than $1.5 million.  *Id.* ¶¶ 2, 7.

23          On February 18, 2020, this Court sentenced Shumpert to 42 months in custody, which was

24  approximately the middle of the applicable Guidelines range of 37 to 46 months.  *See* Dkt. No. 32

25  (Judgment); PSR ¶ 114.  The Court recommended that Shumpert be placed in a facility as close to Long

26  Beach, California as possible, so that he could be near his family.  Dkt. No. 32.  Shumpert is presently

27

28

U.S.' OPP. TO DEF. MOT. FOR COMPASSIONATE
RELEASE
18-CR-00582-VC                                          2

1   serving his sentence at FCI Lompoc in California, with a projected release date of June 16, 2022.

2   http:bop.gov/inmateloc.

3        Shumpert is 52 years old.  PSR ¶ 97.  The U.S. Probation Office's Presentence Investigation

4   Report noted that Shumpert suffered from arthritis and that while he previously suffered from high

5   blood pressure and cholesterol, adjustments to his diet returned his blood pressure and cholesterol to

6   normal levels.  PSR ¶ 104.  The PSR noted that he did not take any medications.  *Id.*

7        On November 25, 2020, Shumpert's attorney submitted a request to the FCI Lompoc warden,

8   seeking his compassionate release on account of his obesity, age, and race.  Dkt. No. 35-2.  Shumpert

9   also described a release pan of moving in with his wife and children in Long Beach, California.  *Id.*

10        On December 21, 2020, Shumpert filed a motion with the Court seeking his early release.  Dkt.

11   No. 35.  In addition to the bases laid out in the letter to the FCI Lompoc warden, Shumpert's motion

12   asserts that he should be released because he has a history of smoking and proposes that he will move in

13   with his elderly mother to assist her with various long-term conditions and then move in with his wife

14   and children thereafter.  Dkt. No. 35.

## ARGUMENT

## I.    SHUMPERT HAS ADMINISTRATIVELY EXHAUSTED

17        Shumpert, through his counsel, submitted a letter dated November 25, 2020, to the warden at

18   FCI Lompoc requesting his compassionate release.  Dkt. No. 35-2.  Because 30 days have elapsed from

19   Shumpert's submission to the warden, this Court can review Shumpert's motion on the merits.  *See* 18

20   U.S.C. § 3582(c)(1)(A).

## II.    REDUCTION OF SHUMPERT'S SENTENCE IS NOT WARRANTED

22        Although the COVID-19 pandemic is an extraordinary world event, Shumpert has failed to show

23   that that its impact on him, specifically, warrants his immediate release pursuant to 18 U.S.C.

24   § 3582(c)(1)(A).  The motion should be denied because Shumpert presents a danger to the community,

25   and re-balancing the section 3553(a) factors—especially the need to afford adequate deterrence, to

26   promote respect for the law, to provide just punishment, and to protect the public—weighs strongly

27   against any reduction in Shumpert's sentence.

28

A.     **Applicable law**

This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *See, e.g.*, *United States v. Reid*, No. 17-cr-00175-CRB-1, Dkt. No. 554 (N.D. Cal. May 5, 2020); *United States v. Robinson*, No. 18-CR-00597 RS, Dkt. No. 33 (N.D. Cal. Apr. 27, 2020).

The pertinent policy statement is set forth at United States Sentencing Guidelines (USSG) § 1B1.13. It prohibits this Court from reducing a defendant's sentence unless the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *See United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. No. 78 (N.D. Cal. May 4, 2020) (denying compassionate release claim due to danger).

The Sentencing Commission also provided explicit examples of what constitutes an "extraordinary and compelling circumstance":

(A)     **Medical Condition of the Defendant.**—

(i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)     The defendant is—

(I)     suffering from a serious physical or medical condition,

(II)     suffering from a serious functional or cognitive impairment, or

(III)     experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C)     **Family Circumstances.** —

    (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)     The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

USSG § 1B1.13 cmt. n.1.

      USSG § 1B1.13 is binding on district court's discretion in determining whether the defendant has presented an extraordinary and compelling reason for early release.  Any reduction in a defendant's sentence under 18 U.S.C. § 3582(c)(1)(A) must be "consistent with applicable policy statements issued by the Sentencing Commission," which are included in USSG § 1B1.13.  The Supreme Court analyzed an identical statutory requirement in § 3582(c)(2) and held that the relevant USSG policy statement is binding, not advisory.  *Dillon v. United States*, 560 U.S. 817, 819, 825–28, 830 (2010).  The same logic applies here.[1]  While some courts have held that the First Step Act of 2018 altered the binding nature of USSG § 1B1.13, which has not been updated since the Act's passage to reflect that defendants can file their own motions after exhausting administrative remedies, the First Step Act did not alter the key language that the Supreme Court found determinative and binding with respect to subpart (c)(2) in *Dillon*.  First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (effective December 21, 2018).  The Second Circuit recently held that USSG § 1B1.13 is out of step with Congress' intent shown by passing the First Step Act and thus does not apply to motions made by defendants rather than the Director of BOP.  *United States v. Brooker*, 976 F.3d 228, 234–37 (2d Cir. 2020).[2]

---

      [1]  As the Court found in *Dillon*, here Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release.  Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples."  The statute also states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

      [2] District courts across the country are divided over this question, including in this district. *Compare United States v. Rodriguez*, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) (holding that because the policy statement has not been revised since the First Step Act was enacted, district courts are free to consider circumstances beyond those enumerated in USSG § 1B1.13), *and United States v. Chan*, 2020 WL 1527895, at *8 (N.D. Cal. Mar. 31, 2020) (same), *with United States v. Flores*, 17-CR-00373-CRB-2, ECF No. 85 at 3 (N.D. Cal. Sept. 21, 2020) (holding USSG § 1B1.13 is still binding and citing

1    This Court should reject the Second Circuit's position, which is inconsistent with *Dillon*—

2    precedent which *Brooker* fails entirely to address.  *See Brooker*, 976 F.3d at 234–38.  This Court should

3    instead join the other courts that have found USSG § 1B1.13 to remain binding, and hold that the policy

4    statement constrains courts in all motions brought under 18 U.S.C. § 3582(c)(1)(A), not just those

5    brought by the Director of BOP.  *See, e.g.*, *United States v. Saldana*, 807 F. App'x 816, 820 (10th Cir.

6    2020) (dismissing motion for lack of jurisdiction where defendant's motion did not claim a reason

7    identified within USSG § 1B1.13).  Following the logic of the Second Circuit's opinion means a

8    defendant could bring a request to BOP that BOP is required to deny under USSG § 1B1.13, but which

9    the district court could then review without any similar limitation.  This would run counter to Congress'

10   intent "to authorize only a limited adjustment to an otherwise final sentence."  *Dillon*, 560 U.S. at 826.

11   Notably, the First Step Act did not change the factors relevant to whether and how the courts

12   should modify a defendant's sentence, only the procedures by which a defendant can raise such claims.

13   Congress could have updated the substantive requirements for § 3582(c)(1)(A) motions, but it did not do

14   so.  Rather, Congress altered only procedurally who could bring a motion under § 3582(c)(1)(A) to the

15   district court, and, indeed, titled the portion of the First Step Act "Increasing the Use and Transparency

16   of Compassionate Release."  *Brooker*, 976 F.3d at 233 (citing P.L. 115-391 § 603(b), 132 Stat. 5194,

17   5239).  But increasing the use of the procedural vehicle, the transparency of the decision-making

18   process, and the speed with which a defendant receives an answer does not implicate *the criteria* courts

19   should use for determining if early release is appropriate.  Congress left the requirements for eligibility

20   untouched by the First Step Act and still squarely within the Sentencing Commission's hands.

21   The best way to align with *Dillon*, preserve the language of USSG § 1B1.13, and remain

22   consistent with Congressional intent, is not to disregard the policy statement entirely when a defendant

23   brings a compassionate release motion, as the Second Circuit held in *Brooker*, 976 F.3d at 234–37, but

24   to continue to use the policy statement to define the criteria for defendants to be eligible for early release

25

26   *Dillon*), *United States v. Eberhart*, 448 F. Supp. 3d 1086, 1090 (N.D. Cal. 2020) (same), *and United*
27   *States v. Shields*, 2019 WL 2645028 (N.D. Cal. June 27, 2019).  *See also United States v. Willingham*,
     2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (collecting district court cases finding USSG
28   § 1B1.13 to be binding, and those finding it not to be).

1   *whether BOP or the defendant makes the motion* for sentence reduction.  At the very least, even courts

2   who "have found the provision to be outdated have held it continues to provide 'helpful guidance.'"  *United*

3   *States v. Burrill*, 445 F. Supp. 3d 22, 24–25 n.2 (N.D. Cal. 2020) (citation omitted).  Continuing to follow the

4   listed reasons in USSG § 1B1.13 also furthers the policy of keeping "statutory exceptions to the general

5   rule of finality of judgment" limited.  *Eberhart*, 448 F. Supp. 3d at 1090 (citing *Dillon* and holding

6   USSG § 1B1.13 is still binding).

7          Thus, in order to qualify for compassionate release after having exhausted his or her

8   administrative remedies with the Bureau of Prisons, a defendant must be able to demonstrate one of the

9   listed reasons in (A)–(C) above.  *See United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. No. 146 (N.D.

10  Cal. May 27, 2020).  The "catch-all" in USSG § 1B1.13 application note 1(D) should be read in the

11  manner of maintaining some administrative discretion within BOP to determine if there are additional

12  reasons, beyond what is strictly described in (A)–(C) but within the same type of considerations (*e.g.*,

13  deteriorating mental or physical health, exigent family circumstances, or medical conditions which

14  diminish an inmate's ability to provide self-care in prison).[3]  In this case, the Director of BOP did not

15  identify any "extraordinary and compelling reason" under Application Note 1(D), which is thus

16  inapplicable to this situation.  *See United States v. House*, No. 14-cr-00196-CRB-1, Dkt. No. 2202 at 4

17  n.2 (N.D. Cal. May 20, 2020) (holding (D) inapplicable even in light of the COVID-19 pandemic).

18  Changes in sentencing law do not fall under any of the categories listed in USSG § 1B1.13.

19         Shumpert bears the burden to show special circumstances meeting the high bar set by Congress

20  and the Sentencing Commission for compassionate release to be granted.  *See United States v. Shabudin*,

21  No. 11-CR-00664-JSW-1, Dkt. No. 571 (N.D. Cal. May 12, 2020); *United States v. Greenhut*, 2020 WL

22  509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of establishing

23  entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th

24  Cir. 1998)).

25

26  _____

27         [3]  Indeed, BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to
    set forth its own internal criteria for evaluating compassionate release requests.  *See*
    https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

28

1       For that reason, to state a cognizable basis for a sentence reduction based on a medical condition,

2   Shumpert first must establish that his condition falls within one of the categories listed in the policy

3   statement.  Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any

4   "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to

5   provide self-care within the environment of a correctional facility and from which he or she is not

6   expected to recover."  USSG § 1B1.13 cmt. n.1(A).  If a defendant's medical condition does not fall

7   within one of the categories specified in the application note (and no other part of the application note

8   applies), his or her motion must be denied.

9       The existence of the COVID-19 pandemic, which poses a general threat to every non-immune

10  person in the country, does not by itself fall into either of those categories and therefore could not alone

11  provide a basis for a sentence reduction.[4]  As Chief Judge Hamilton held in this district, "General

12  concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and

13  compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy

14  statement on compassionate release, U.S.S.G. §1B1.13."  *Eberhart*, 448 F. Supp. 3d at 1090; *see also*

15  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society

16  and the possibility that it may spread to a particular prison alone cannot independently justify

17  compassionate release, especially considering BOP's statutory role, and its extensive and professional

18  efforts to curtail the virus's spread.").  The categories encompass specific serious medical conditions

19  afflicting an individual inmate, not generalized threats to the entire population.

20      Nor would a defendant's chronic but manageable underlying medical condition, alone, constitute

21  "extraordinary and compelling" circumstances.  *See United States v. Arceo*, No. 09-CR-00616-EJD-1,

22  Dkt. No. 86 (N.D. Cal. May 22, 2020) ("[T]he mere fact that Defendant suffers from chronic conditions

23  is insufficient [for compassionate release].").  Indeed, before the outbreak of COVID-19, district courts

24  addressing § 3582(c)(1)(A) claims routinely noted:  "To be faithful to the statutory language requiring

25

26  _____

27      [4]  Indeed, it is reported that some inmates are *trying* to contract COVID-19 in the hopes that it
    will enable them to get released from prison.  *See*
28  https://www.washingtonpost.com/nation/2020/05/12/inmates-coronavirus-infect-los-angeles/ (inmates in
    LA county jail have attempted to infect themselves with COVID-19 in order to be released).

'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from.  Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).  Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims.  *See Arceo*, No. 09-CR-00616-EJD-1, Dkt. No. 86 (noting compassionate release is rare); *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)).

But the combination of an inmate's chronic medical condition and the risk of contracting COVID-19 in a custodial setting may constitute an extraordinary and compelling reason to grant a motion under 18 U.S.C. § 3582(c)(1)(A), where COVID-19 and an inmate's medical condition would not individually suffice.  If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[5] that condition—in combination with the likelihood that a defendant may contract COVID-19 while incarcerated and suffer severe symptoms as a result—may constitute a "serious" medical condition "from which [the defendant] is not expected to recover," which "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility."  USSG § 1B1.13 cmt. n.1(A)(ii)(I).  But as part of its analysis of the totality of circumstances, the Court should also consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated.  That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

### B.    Shumpert's extraordinary and compelling reasons

The government does not oppose Shumpert's motion on the ground that he has not presented extraordinary and compelling reasons.

---

[5]  *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified July 17, 2020).

It is true that Shumpert's severe obesity places him at increased risk of severe illness according to CDC guidelines.  The government notes, however, that an individual's body weight can fluctuate, sometimes quite significantly, over time.

That said, Shumpert already tested positive for COVID-19 in custody, and he recovered from the virus without suffering severe health consequences.  When he was an inmate at Santa Rita Jail in April 2020, Shumpert tested positive for COVID-19 despite the jail's best efforts to contain the virus.  He was treated in custody and separated from other inmates during that treatment.  Shumpert did not have any significant medical complications.  *See* Dkt. No. 35-3.[6]  These facts are a far cry from the severe consequences that Shumpert presumes would occur if he is infected again, and courts have denied compassionate release motions under similar circumstances.  *See United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. No. 146 (N.D. Cal. May 27, 2020) (denying compassionate release where inmate tested positive for COVID-19 but had already recovered); *United States v. Krietzman*, 2020 WL 4368191, at *3 (N.D. Cal. July 30, 2020) (noting that prior asymptomatic case of the virus is strong evidence that defendant's medical conditions would not induce a more severe illness); *see also United States, v. Garcia*, 2020 WL 7488675, at *2 (N.D. Ind. Dec. 21, 2020) ("Anecdotal information, not scientifically confirmed, about cases of presumptive reinfection involving more severe illness than the initial bout of COVID, are not a compelling basis for granting relief under § 3582(c)(1)(A)(i).").  The science surrounding COVID-19 and the possibility of reinfection is still developing, but Shumpert's recovery is an extremely positive sign.  Foremost, and most importantly, it means that he has endured the illness seemingly without substantial adverse health outcomes and has returned largely to his baseline health status.  Additionally, if COVID-19 acts like other viruses, it may mean that he is no longer at risk of reinfection, although again, the science is still developing on this particular coronavirus.[7]

---

[6] At the time of his initial positive diagnosis, Shumpert asserted he was mistreated at Santa Rita Jail, and his motion includes similar assertions.  Although the government is not opposing the motion based on Shumpert's inability to show extraordinary and compelling reasons, the government notes that Shumpert's assertions of mistreatment at Santa Rita were strongly refuted by the jail and United States Marshals at the time and also notes that Shumpert chose not to file a motion seeking his release until now, approximately 8 months later.

[7] *See, e.g.*, Centers for Disease Control, *Duration of Isolation and Precautions for Adults with COVID-19, available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last updated Sept. 10, 2020) (indicating adults who test positive for COVID-19 may continue to have low

1     The other health conditions Shumpert cites in his motion are either unsupported by evidence or

2     do not place him at higher risk according to CDC guidelines.  An attorney declaration asserts that

3     Shumpert has a history of smoking.  Although the government acknowledges that the CDC recognizes

4     that a history of smoking may increase a person's risk of severe illness from COVID-19, courts are

5     divided on the question of whether that is enough to provide extraordinary and compelling reasons for

6     relief during the COVID-19 pandemic, *see United States v. Noel*, 2020 WL 6505039, at *3 (D. Nev.

7     Nov. 5, 2020), and Shumpert's history of smoking is not described in his medical records or the PSR in

8     any event.  *Id.* (denying motion because defendant did not provide evidence of underlying medical

9     conditions, including smoking history).

10    Shumpert also points to his high cholesterol and hypertension as additional bases for his motion,

11    but the PSR states that Shumpert's cholesterol has been effectively managed through medication.  PSR

12    ¶ 104.  And it appears to the government that Shumpert has never been diagnosed with pulmonary

13    hypertension—a specific type of severe hypertension—which is a CDC-identified COVID-19 risk

14    factor.  While pulmonary hypertension—a condition specific to the linkage between the heart and the

15    lungs—is listed as a CDC risk factor for COVID-19, essential hypertension is not.  *See also United*

16    *States v. House*, No. 14-CR-00196-CRB-1, Dkt. No. 2202 (N.D. Cal. May 20, 2020) (denying

17    compassionate release based in part on finding essential hypertension, along with other non-CDC-

18    identified risk factors, did not qualify as an extraordinary and compelling reason); *see also United States*

19    *v. Carlisle*, No. 4:13-cr-00466-JSW, Dkt. No. 825 (N.D. Cal. Sept. 8, 2020) (denying motion for

20    compassionate release in part because defendant was 31 years old with high blood pressure but no other

21    CDC-identified heightened medical risk factors).

22    Finally, Shumpert's race or age alone do not constitute extraordinary and compelling reasons for

23    release.  *See*, *e.g.*, *United States v. Wade*, 2020 WL 3254422, at *3 (N.D. Cal. June 16, 2020); § 1B1.13

24    cmt. n.1(A)(ii)(III).

25    Furthermore, BOP has taken significant measures to protect the health of inmates in its charge.

26

27    levels of the virus in their bodies for up to three months); ; *see also*
      https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html ("Cases of reinfection with

28    COVID-19 have been reported, but remain rare.").

1    BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic

2    Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

3    https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed,

4    establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a

5    "[s]uspected human outbreak overseas." *Id*. at i.  The plan addresses social distancing, hygienic and

6    cleaning protocols, and the quarantining and treatment of symptomatic inmates.  The Action Plan

7    requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period

8    of at least 14 days, in order to stop any spread of the disease.  Only limited group gathering is afforded,

9    with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers,

10   telephone, and computer access.  Further, BOP has severely limited the movement of inmates and

11   detainees among its facilities.  Though there will be exceptions for medical treatment and similar

12   exigencies, this step as well will limit transmissions of the disease.  Likewise, all official staff travel has

13   been cancelled, as has most staff training.  All staff and inmates have been and will continue to be issued

14   face masks and strongly encouraged to wear an appropriate face covering when in public areas when

15   social distancing cannot be achieved.

16        The Action Plan comprises of several additional preventive and mitigation measures, including

17   suspension of social visitation, internal inmate movements, legal visits, official staff travel, training,

18   access by volunteers and many contractors; extensive screening of staff and inmates (including

19   screening of all new inmates); quarantine; and modified operations to maximize social distancing as

20   much as practicable.  *See* Federal Bureau of Prisons, BOP Implementing Modified Operations, *available

21   at* https://www.bop.gov/coronavirus/covid19_status.jsp (updated November 25, 2020).  All new BOP

22   inmates are screened for COVID-19 symptoms and risk of exposure, including a temperature check and

23   approved viral PCR test.  Inmates who arrive symptomatic or who test positive will be placed in medical

24   isolation, and inmates who arrive asymptomatic and test negative are placed in quarantine.  Inmates who

25   develop symptoms in quarantine are re-tested.  At the end of the 14-day quarantine, an inmate will be

26   retested for COVID-19.  If the test is negative, the inmate will be deemed appropriate to transfer from

27   the quarantine site to their designated institution.  Both inmates and staff are required to wear face masks

28

during any transfer that occurs.

Additionally, in light of the global pandemic, the BOP has been given expanded authority to review inmates who are potentially vulnerable to COVID-19 earlier in their sentences for transfer from a secure facility to home confinement.  The Attorney General has directed the Director of the BOP to prioritize granting home confinement to eligible inmates who are especially vulnerable to COVID-19 based on their age and underlying health conditions as identified by the Centers for Disease Control and Prevention ("CDC"), where home confinement would be more effective in protecting their health, and not present a great risk to public safety.  Att'y Gen. Memo. (Mar. 26, 2020).  The Attorney General has also invoked his emergency authority to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281, § 12003(b)(2) (March 27, 2020).  As a result, BOP is broadly evaluating inmates for placement in home confinement according to internal guidelines, with priority given to those most vulnerable to COVID-19 and those at facilities most affected by COVID-19.  Att'y Gen. Memo. (April 3, 2020); *see also* BOP Memo. (May 8, 2020) (providing updated guidance allowing for consideration for home confinement of inmates with minor disciplinary issues within the past twelve months).

Pursuant to the Attorney General's directive, BOP is urgently assessing the inmate population for home confinement.  To date, BOP has transferred 19,469 inmates to home confinement since March 26, 2020, and BOP continues to aggressively screen all potential inmates for eligibility, without any need by the inmate to apply for consideration.  *See* COVID-19 Home Confinement Information, https://www.bop.gov/coronavirus/ (updated every day at 3:00pm EST and last checked on Dec. 28, 2020).[8]

---

[8] The government notes, and the Court is likely aware, that BOP has exclusive authority to determine the location where an inmate serves his or her custodial sentence, including whether transfer from a secure facility to home confinement under 18 U.S.C. § 3624(c) is more appropriate for a particular defendant.  *See United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and regulate all federal penal and correctional institutions."); *see also Bonneau v. Salazar*, 804 F. App'x 717, 718 (9th Cir. 2020) (holding home confinement is a decision that is solely within the province of the BOP); *see also Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Shumpert is serving his sentence at FCI Lompoc, which has zero known active cases of inmates or staff testing positive for COVID-19 and 3 COVID-19-related deaths and therefore is not currently experiencing an outbreak. *See* https://www.bop.gov/coronavirus/ (last checked Dec. 28, 2020). The adjacent USP Lompoc facility currently reports 6 known active cases of inmates and 4 known active cases of staff testing positive for COVID-19 and 2 COVID-19-related deaths. *Id.*

Although Shumpert's release plan states that he will start out living with his elderly mother, her temporary need for care does not amount to exigent family circumstances that would warrant release. *See United States v. Shields*, 2019 WL 2359231, at *5 (N.D. Cal. June 4, 2019) (denying claim for release to care for daughter with epilepsy where defendant's partner worked full-time in part because "if this Court were to conclude that [the daughter's] circumstances warrant a reduction in [defendant's] term of imprisonment, the same could be said of *any* inmate who has young children and a spouse who must work" (original emphasis)).

**C.     This Court may not modify Shumpert's sentence because he is a danger to others**

This Court may not reduce Shumpert's sentence unless it finds that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13(2).  *See Cazarez*, No. 15-CR-00362-CRB-1, Dkt. No. 78 (denying compassionate release claim due to danger).  This record precludes such a finding.

Shumpert's argument is that given his age, health, and good conduct in prison, this Court should conclude he no longer presents a danger or that any potential danger is outweighed by the risk he will contract COVID-19.  But many defendants "do well" in prison only to revert to crime upon their release. And many fraud defendants "do well" in prison simply because they are deprived of the opportunity to

---

[the place of imprisonment and treatment programs].")  Although this Court may make a non-binding recommendation to BOP as to home confinement, BOP's designation decision "is not reviewable by any court."  18 U.S.C. §§ 3621(b) & 3624(c); *see, e.g.*, *United States v. Kim*, No. 17-CR-00355-YGR-1, Dkt. No. 96 (N.D. Cal. May 1, 2020) (denying defendant's motion for compassionate release but recommending BOP place defendant in home confinement); *United States v. Jones*, No. CR 17-070 VC, Dkt. No. 93 (N.D. Cal. Apr. 10, 2020) (same); *United States v. Fobbs*, No. 19-CR-410 WHA, Dkt. No. 32 (N.D. Cal. Apr. 7, 2020) (recommending BOP place defendant in home confinement).

1   commit their scams.  The standard for compassionate release is not just whether someone is at risk to

2   COVID-19 and has performed well in prison.  *See* USSG § 1B1.13 app. note 3 ("Pursuant to 28 U.S.C.

3   § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for

4   purposes of this policy statement.").  Shumpert must also show that he will not be a danger if released.

5   He cannot do so.  *See United Sates v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. No. 351 (N.D. Cal. Apr.

6   23, 2020) (concluding, in the pre-trial detention context, that "the balancing of the factors does not

7   warrant [defendant's] release [because he] continues to pose a serious risk to the safety of the

8   community, and that risk overrides [defendant's] concerns that he might contract COVID-19 at [local

9   jail].").  Recognizing that there is a significant difference between doing well in prison and doing well in

10  society, this Court must look to the factors set forth in 18 U.S.C. § 3142(g).

11          Under § 3142(g), the Court must consider four factors in determining whether the defendant

12  might present a danger:  (1) the nature and circumstances of the offense charged; (2) the weight of the

13  evidence against the defendant; (3) the history and characteristics of the defendant, including the

14  defendant's character, physical and mental condition, family and community ties, past conduct, history

15  relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4)

16  the nature and seriousness of the danger to any person or the community that would be posed by the

17  person's release.  18 U.S.C. § 3142(g)(1)–(4).  Consideration of these factors—which are not affected by

18  COVID-19—does not allow this Court to conclude that Shumpert is not a danger to the safety of any

19  other person or the community.

20          Shumpert argues that he poses no risk of physical danger if released (Dkt. No. 35 at 16), but

21  danger to the community is not limited to physical harm or violence.  Danger can take different forms,

22  including the significant and long-lasting economic harm Shumpert imposed on victim after victim in

23  this case.  *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at

24  least in some cases, encompass pecuniary or economic harm."); *United States v. Harris*, No. 18-20343,

25  2018 WL 3239624, at *3 (E.D. Mich. July 3, 2018) ("Defendant also allegedly has obstructed justice by

26  attempting to destroy evidence while in jail, which suggests that she would take other illegal actions if

27  released."); S. Rep. No. 98-225 at 12-13 (Senate Judiciary Committee report on Bail Reform Act,

28

stating, among other things, that the Committee "intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). Shumpert lied to his victims about who he was and what he did. To victim N.A.M, Shumpert was Randall Turner and owned ViseVersa Entertainment; to victim N.N.M, he was Rico Turner and owned New King; and to victim J.Z., he was Randy Goodman and owned Baybizz Productions. PSR ¶¶13, 34, 40. And so on.

Shumpert grew close to his victims, earning their trust by tricking them into thinking they were in a genuine romantic relationship. He met N.A.M. through an online dating website and quickly told her that the two of them were "[f]or life…I'll always be here for you…LOYALTY." Paidipaty Decl. Ex. 2, Text Messages Between N.A.M. and Shumpert, RES-000805. Over time, he intertwined his expressions of affection with requests for money. He wrote, "I need $19k…babe I love you and promise to always be your man…" *Id.*, RES-000835. The following day he texted, "Ok babe…I'm up..let's get the wire done. LOVE YOU. Call me when your [sic] at the bank." *Id.* Shumpert continued lying to N.A.M. and causing her to believe that the two were in a committed relationship and would eventually get married. He asked, "What do you think about me moving back to the bay??" *Id.*, RES-000841. At the time, Shumpert lived in Southern California. On another occasion he claimed to have bought her an engagement ring. *Id.*, RES-0001044.

The entire time, Shumpert solicited his victims for investments in his fake entertainment company. Shumpert promised huge returns to his victims, returns that he knew he would never pay. *See, e.g.*, PSR ¶¶ 14, 19, 28, 35, 47, 53, 64. For example, after they began dating, Shumpert asked S.V. about her savings and found out that S.V. had set aside money for her daughter. *Id.* Shumpert lied to S.V., promising her he could get her more money back if she gave him her savings.

After failing to repay these amounts, Shumpert further emotionally manipulated his victims when they confronted him over the false promises or refused to further "invest." When N.A.M. hesitated to give him more money, he wrote, "Guess you can care less, not even offer support, maybe I'm not the man for you sorry to waste your time, but I do thank you for letting me know that I'm able to love." Paidipaty Decl., Ex. 2, RES-000808. At other times, Shumpert told outlandish tales about being threatened by loan sharks or being propositioned by women who would pay him for sex. PSR ¶¶ 24-26,

46.  Whether it was cold indifference or frantic claims of fear, Shumpert's tactics often had their desired effect as his victims ultimately gave him more money despite their reservations.

In the end, all of Shumpert's lies caused real harm to real people.  Shumpert's victims turned over substantial amounts of money from their savings that they never got back.  Victim N.A.M. lost $387,750 to Shumpert's scheme.  PSR ¶ 33.  Victim J.Z. withdrew over $150,000 from her 401(k) to invest in Shumpert's fake business opportunities.  PSR ¶ 40.  And Victim S.V., a single mother, turned over everything she had set aside for her young daughter's education.  PSR ¶ 53, 55; *see also* S.V. Victim Impact Statement.

Shumpert's criminal history is further proof of the danger he poses to the community.  That is because all of this happened before.  In 2002, Shumpert engaged in a fraud scheme nearly identical to the one to which he pled guilty.  PSR ¶ 89.  There, Shumpert defrauded ten individual victims by making them believe he worked for various events and entertainment groups promoting musical acts. *Id.*  "Shumpert promised large returns to the victims," but when the victims came for their returns, Shumpert and the victims' promised payouts were nowhere to be found.  *Id.*  Shumpert did not actually work for the entertainment companies as he told the victims.  *Id.*  Shumpert caused losses of approximately $173,650.  *Id.*  In 2008, Shumpert was sentenced to 32 months in prison for this conduct. *Id.*  Moreover, that 32-month prison sentence followed another theft of property conviction out of Texas from 2003, for which Shumpert was sentenced to 3 years in prison.  PSR ¶ 88.

Not only does Shumpert present a danger to the community, but the community itself is more vulnerable to such danger given the COVID-19 pandemic.  For example, the FDIC is now warning bank customers that "some people may take advantage of COVID-19 by using fraudulent websites, phone calls, emails, and text messages claiming to offer 'help' but may be trying to trick people into providing Social Security numbers, bank account numbers, and other valuable details."  *See* https://www.fdic.gov/coronavirus/faq-customer.pdf; *see also* https://www.timesrecordnews.com/story/news/local/2020/03/23/doj-files-first-covid-19-fraud-action/2897805001 (report regarding civil action against website "coronavirusmedicalkit.com," which claimed to offer WHO vaccine kits).

In the current climate, irresponsible social habits can also endanger the health of the community. *United States v. Hir*, 517 F.3d 1081, 1088 (9th Cir. 2008) (holding that "community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography).  The entire state of California is currently ordered to "heed the current State public health directives" to avoid the spread of COVID-19.  Such rules, though enforced by peace officers, rely largely on voluntary compliance.  A person who ignores such admonitions and rules could increase infection rates, leading to severe illness and death.  Shumpert has shown an unwillingness to follow rules and a disregard for the welfare of others.  Releasing Shumpert from his detention, and adding him back into the general population, is antithetical to the concept of sheltering-in-place.

In sum, Shumpert remains a danger to the community, so the Court may not release him.

**D.** **Section 3553(a) factors weigh against his release**

Finally, any compassionate-release decision—even for a statutorily eligible defendant—must also consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Shayota*, No. 15-CR-00264-LHK-1, Dkt. No. 780 (N.D. Cal. May 26, 2020) (denying compassionate release for defendant who served less than 6% of his custodial sentence based on analysis of section 3553(a) factors); *United States v. Furaha*, No. 09-CR-00742-JST-1, Dkt. No. 36 (N.D. Cal. May 8, 2020) (denying compassionate release for defendant who served roughly 20% of his sentence based on analysis of section 3553(a) factors).  The Third Circuit has specifically held that length of time remaining on a defendant's sentence is an appropriate consideration for determining whether to reduce a sentence under 18 U.S.C. § 3582(c)(1)(A).  *United States v. Pawlowski*, 967 F.3d 327, 330–31 (3d Cir. 2020); *see also United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (holding the district court did not abuse its discretion in holding the § 3553(a) factors did not warrant release where defendant had served less than half his sentence, even though the defendant's medical condition qualified as an extraordinary and compelling circumstance).

The Court already considered the section 3553(a) factors when imposing Shumpert's sentence, and those factors do not support his request for premature, permanent release.  At the sentencing hearing, the Court noted that it was struck by Shumpert's "campaign" to identify and defraud his

victims.  For several years, Shumpert preyed on single women and manipulated them into giving him

hundreds of thousands of dollars that he spent on everything from luxury cars to trips to casinos.  The

entire time, Shumpert convinced each woman that the two of them were in a romantic relationship and

had a promising future together.  He used that relationship to get close to the women and emotionally

manipulated them into giving him money.  When one women said she used $2,200 to pay her rent and

therefore could not give it to Shumpert, he responded, "You just didn't want to give me the

2200…lol…"  PSR ¶ 65.  Through these guilt trips and other lies, including claims that loan sharks were

threatening to kill him, Shumpert extracted more and more money from his victims.  PSR ¶¶ 11; 24, 26.

The victims pleaded with Shumpert for some sort of repayment, explaining that they were on the verge

of financial ruin.  One wrote him, "All I ever did was love you and try to help you.  I took money from

my son and lived in lesser conditions than I deserved for this entire year all so that you could get

ahead…I have over 100k in loans out that I can't pay and my credit is ruined because of what I did to

help you."  Paidipaty Decl.", Ex. 1, E-mail from N.L.M. to Defendant, RES-001475.  Ultimately,

realizing that they had been duped, most victims gave up trying to contact Shumpert.

In total, Shumpert defrauded at least six women of over $650,000.  Shumpert's fraud wreaked

havoc on his victims' lives.  At least two victims took money out from their retirement savings for

Shumpert and another dipped into a savings account meant for her child's education.

And shockingly, he did all of this after he received a 32-month prison sentence for grand theft in

Santa Clara County for engaging in a similar fraud scheme, robbing ten victims of nearly $175,000.

PSR ¶ 89.  That sentence followed a separate three-year prison sentence imposed in 2003 for a theft

conviction in Texas.  PSR ¶ 88.  Neither prison sentence deterred Shumpert from once more targeting

others and stealing their money.

Granting Shumpert's motion under 18 U.S.C. § 3582(c)(1)(A) would undermine the goals of

sentencing.  It would not deter Shumpert from committing his fraud scheme yet again, it would not

promote respect for the law, it would not protect the public, and it would not provide just punishment.

*See, e.g.*, *United States v. Verderosa*, No. 17-CR-0372-9(JS), 2020 WL 6449238, at \*4-5 (E.D.N.Y.

Nov. 2, 2020) (sentence reduction would not "reflect the harm suffered" on account of fraud scheme that

1 "aggressively targeted vulnerable and elderly victims," despite the fact that defendant was 70 and

2 suffered from diabetes and heart disease and was a former smoker).  It would result in an effective

3 sentence of approximately 18 months, which is approximately 50% of Shumpert's prior prison sentences

4 for theft and grand theft in Texas and California in the early 2000s.  PSR ¶¶ 88-89.

5          Shumpert has served approximately 42% of his current sentence.  Although Shumpert argues that

6 various credits could have reduced his overall sentence had certain BOP programming been available,

7 he is not entitled to those credits, and there is no assurance that he would have received them.  And

8 while Shumpert vaguely asserts that a job, addiction treatment, and his family will ensure his good

9 behavior if released, his motion ignores the fact that he repeated the same fraud scheme many different

10 times over the last two decades between his various fraud convictions.  Shumpert's motion simply fails

11 to answer questions about whether supervision on probation is an adequate alternative punishment at this

12 point.  *See, e.g.*, *United States v. Nassar*, 2020 WL 6484181, at *3 (E.D. Cal. Nov. 4, 2020) ("This

13 summary leaves several questions unanswered. What type of counseling does [the defendant] plan to

14 attend, assuming his supervising probation officer approves, for example, and where? What negative

15 influences does he intend to avoid? How?").  Releasing Shumpert outright would not appropriately re-

16 balance the § 3553(a) factors of this case, particularly given that the present conditions caused by the

17 pandemic are likely impermanent given the recent approvals of vaccines.

18 **III.     IF THIS COURT MODIFIES SHUMPERT'S SENTENCE, IT SHOULD DO SO WITH
         APPROPRIATELY RESTRICTIVE CONDITIONS**

19

20          If the Court is inclined to grant Shumpert's motion for compassionate release, this Court should

21 reduce Shumpert's sentence to time served but substitute a term of probation or supervised release with

22 a condition of home confinement for the duration of Shumpert's current sentence of imprisonment (until

23 June 16, 2022), to be followed by a term of supervised release with conditions as ordered by the Court at

24 Shumpert's original sentencing hearing.[9]

25

26          [9] The Sixth Circuit recently noted that, while § 3582(c)(1)(A) does not authorize district courts to
order defendants to serve their current sentences on home confinement, "if the district court reduces a
defendant's sentence under § 3582(c)(1)(A) to time served, it can impose a term of supervised release

27 equal to the unserved time and order, as a condition of that supervised release, that the defendant be
confined to his home."  *United States v. Spencer*, __ F. App'x __, No. 20-3721, 2020 WL 5498932, at

28 *2 (6th Cir. Sept. 2, 2020) (citing 18 U.S.C. § 3853(d); USSG § 5F1.2).  "Thus, with a few extra steps, a

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, the Court should deny Shumpert's motion for immediate release under 18 U.S.C. § 3582(c)(1)(A)(i).

DATED:  December 28, 2020                              Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
PATRICK K. O'BRIEN
Assistant United States Attorney

---

district court can craft a reduced sentence that, for all practical purposes, looks very much like ordering that the defendant be allowed to spend the remainder of his current sentence on home confinement." *Id.* (internal quotation omitted).  But the appellate court cautioned that a district court may do so "only if it finds that the defendant meets the criteria set forth in § 3582(c)(1)(A) and USSG § 1B1.13." *Id.*