STEVEN G. KALAR
Federal Public Defender
Northern District of California
JENYA PARKMAN
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Jenya_Parkman@fd.org

Counsel for Defendant Shumpert

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RANDALL ELIJAH SHUMPERT,<br><br>Defendant. | Case No.: CR 18–00582 VC<br><br>REPLY ON MOTION FOR MODIFICATION OF IMPOSED TERM OF IMPRISONMENT (COMPASSIONATE RELEASE) |

## INTRODUCTION

This Court should replace the remainder of Randall Shumpert's custodial sentence with a special term of supervised release on home confinement because—as the government concedes—his medical conditions increase his risk of COVID-19 complications. Mr. Shumpert's continued confinement at the Lompoc prison complex— the site of an active COVID-19 outbreak—threatens his life. And his ailing, 78-year-old mother's need for his care further compels release.

The sentencing factors do not preclude this relief. Contrary to the government's arguments, Mr. Shumpert will not be a danger on home confinement. His advanced age,

exemplary prison record, previous success on parole, and the close supervision of the United States Probation Department during home confinement, all reduce his recidivism risk. Further, as many courts have found when granting compassionate release to fraud defendants with criminal histories more troubling than Mr. Shumpert's, the extraordinary and compelling risks to medically vulnerable defendants during this pandemic generally outweigh the risk that those defendants will commit a financial crime on supervised release.

For Mr. Shumpert, other sentencing factors also support his requested relief. If the pandemic had not interrupted BOP's programming, he would likely already be out of prison. As it is, he has served more than half his expected sentence, and has done so in especially harsh conditions. On supervised release, he can attend necessary addiction and gambling treatment, which has not been available in prison. And he also has a job waiting for him, which would allow him to make restitution payments.

## ARGUMENT

### I. The government concedes that Mr. Shumpert is vulnerable to severe illness and death from COVID-19.

The government acknowledges that Mr. "Shumpert's severe obesity places him at increased risk of severe illness according to CDC guidelines," and therefore "does not oppose Shumpert's motion on the ground that he has not presented extraordinary and compelling reasons."[1]

### II. Sentencing factors counsel replacing remainder of Mr. Shumpert's custodial sentence with a special term of supervised release.

The sole issue before this Court is thus whether, "even though extraordinary and compelling circumstances warrant a sentence reduction in this case, [Mr. Shumpert] nonetheless needs to be incarcerated in order to protect the public from his future crimes or to promote any other purpose of punishment."[2] There is no such need here.

---

[1] Opp'n 9–10, Dec. 28, 2020, ECF No. 38; *see id.* at 10 n.6 ("[T]he government is not opposing the motion based on Shumpert's inability to show extraordinary and compelling reasons[.]").
[2] *United States v. Dunlap*, No. 17-CR-207 (KBJ), 2020 WL 5231359, at *5 (D.D.C. Sept.

### A. Recidivism risk does not outweigh extraordinary and compelling reasons for sentence reduction.[3]

The government argues that Mr. Shumpert is a danger and should not be released because of his offense conduct and criminal history.[4] These arguments are unpersuasive for two reasons. First, courts have found extraordinary and compelling reasons during the pandemic to outweigh similar concerns. Second, other factors, including Mr. Shumpert's age, good prison behavior, prior success on parole, and the close supervision of United States Probation, mitigate the danger that he might commit a financial crime while on home confinement.

Mr. Shumpert acknowledges that the fraud he perpetrated was reprehensible and caused significant harm to his victims—whose trust he abused. He also acknowledges that this was not his first offense—he committed theft of government property in 1999 and fraud in 2002. During this pandemic, however, courts have granted release to medically vulnerable defendants with similar (and worse) equities. One example is *United States v. Edward Johnson*, in which the defendant defrauded "41 victims out of more than $1.2 million" during an extensive five-year scam—a scam that he continued while on pretrial bond.[5] The defendant's criminal history included another felony fraud

---

2, 2020).
[3] The government argues that Mr. Shumpert is dangerous under 18 U.S.C. § 3142(g), which is the section cited in USSG § 1B1.13. *See* Opp'n 4–9, 14–18. But as all four appellate courts to consider the issue have held, *see* Mot. 13 n.106, that sentencing guideline does not govern compassionate-release motions brought by defendants. Nonetheless, district courts have pointed out that the sentencing factors in 18 U.S.C. § 3553(a) incorporate the same concerns as § 3142(g). *See United States v. Beck*, 425 F. Supp. 3d 573, 584 (M.D.N.C. 2019) ("The old policy statement also requires that the defendant not pose a 'danger to the safety of any other person or to the community' under 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). This inquiry heavily depends on the nature and circumstances of the offense and the history and characteristics of the defendant, § 3142(g)(1), (3), both of which are core considerations in the § 3553(a) analysis. As such, the Court will consider dangerousness together with the other applicable § 3553(a) factors[.]"); *United States v. Sawicz*, 453 F. Supp. 3d 601, 606 (E.D.N.Y. 2020) ("The § 3142(g) factors are largely duplicative of those in § 3553(a)."); *United States v. Shia*, No. 15-CR-00257-VC-1, 2020 WL 5510723, at *1 (N.D. Cal. Sept. 11, 2020) (Chhabria, J.) (considering "[]danger to the community" alongside "remaining sentencing factors"). Mr. Shumpert therefore addresses the government's argument about danger under the umbrella of the sentencing factors.
[4] Opp'n 14–17.
[5] No. CR 4:16-577-BHH-1, 2020 WL 4501513, at *6–7 (D.S.C. Aug. 5, 2020).

conviction and a conviction for "breach of trust/obtaining property under false tokens," and the defendant had "also committed the instant offense while on state probation."[6] The defendant had also sustained a BOP disciplinary violation for possessing a cell phone within the last year.[7] Nonetheless, the district court released the defendant after he had served half his 50-month sentence because "the § 3553(a) factors, when considered in the context of the pandemic and extenuating circumstances faced by Johnson's family [an ill child], do not prevent the award of a sentence reduction in this case."[8]

*Edward Johnson* is not an outlier. In *United States v. Davidson*, the district court released a fraud defendant despite his "lengthy criminal history and a habit for recidivism."[9] In *United States v. Hunt*, the district court released a fraud defendant who had served 30% of his custodial sentence, and had recent prior convictions for armed robbery, firearm offenses, and drug trafficking.[10] In *United States v. Elbert Johnson,* the district court released a defendant who had defrauded incarcerated women, and had a prior criminal history that included a weapons offense.[11] In *United States v. Cosgrove*, the district court released a defendant whose fraudulent scheme resulted in "millions of dollars stolen from his victims," including from "the widow and children of his best friend" and "the wife and children of another friend."[12] In *United States v. Chapman*, the district court released a defendant who had committed the conduct underlying his fraud conviction while on bond for a separate fraud offense.[13] In *United States v. Schumack*, the district court released a fraud defendant despite recognizing that "he has inflicted severe financial harm on a great number of

---

[6] *Id.*, at *7.
[7] *Id.*
[8] *Id.*
[9] No. 2:16-CR-00139-2, 2020 WL 4877255, at *21 (W.D. Pa. Aug. 20, 2020).
[10] 459 F. Supp. 3d 932, 934 (E.D. Mich. 2020).
[11] No. 2:14 CR 80, 2020 WL 4048140, at *3 (N.D. Ind. July 17, 2020)
[12] 454 F. Supp. 3d 1063, 1064 (W.D. Wash. 2020).
[13] No. 09-CR-0741, 2020 WL 2850984, at *2 (N.D. Ill. June 2, 2020).

individuals, including the individuals who filed victim impact statements."[14] Finally, in *United States v. Nieves*, the district court released the defendant despite the following facts:

> Defendant's offense was heinous. He impersonated a federal officer to defraud desperate immigrants. His crime impaired faith in government and exploited the vulnerable. He has committed similar crimes many times in the past—regularly for essentially his entire adult life. The instant case was his eleventh conviction, his sixth felony and second federal conviction. He has repeatedly committed crimes while under supervision.[15]

These cases show that the risk of COVID-19 to medically vulnerable defendants convicted of fraud generally outweighs the danger that these defendants may commit a financial crime on home confinement.

In Mr. Shumpert's case, this danger is mitigated by several additional factors. First, he is now 52 years old. The recidivism rate for federal offenders convicted of fraud and released when they were 50 to 59 years old is only 7.8%.[16] Second, his spotless disciplinary record in prison cuts against finding that he is dangerous.[17] Third, if released, Mr. Shumpert will be on home confinement and under the close supervision of the United States Probation Department. In the past, Mr. Shumpert has successfully

---

[14] No. 14-80081-CR, 2020 WL 4333526, at *4 (S.D. Fla. June 11, 2020).
[15] 465 F. Supp. 3d 352, 353–54 (S.D.N.Y. 2020); *see id.* at 355 ("The Court is aware of the irony that it is ordering compassionate release for a defendant who had no compassion for the many victims of this offense, and the many victims of whom he has taken advantage over the course of his life. Defendant is advised that the Court will regard it a serious violation of the trust the Court has placed in him if he fails to abide by any of the previously imposed conditions of supervised release or any of the additional conditions set forth above, and that it will not hesitate to return him to prison if his actions justify it.").
[16] *See The Effects of Aging on Recidivism Among Federal Offenders* A-41, United States Sentencing Commission, (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.
[17] *See, e.g., United States v. Kelley*, 464 F. Supp. 3d 1134, 1137 (N.D. Cal. 2020) (Illston, J.) (holding that defendant poses no danger to the community because his positive behavior in prison, while "not a guarantee of what his life outside of prison will be,[] is a powerful indicator"); *United States v. Diep Thi Vo*, No. 15-CR-00310-BLF-2, 2020 WL 2300101, at *4 (N.D. Cal. May 7, 2020) (citing defendant's positive "record while in custody" as persuasive that defendant "will not pose a threat to the community"); *United States v. Reid*, No. 17-CR-00175-CRB-2, 2020 WL 2128855, at *2 (N.D. Cal. May 5, 2020) (citing that defendant had "no history of disciplinary issues in custody" to support lack-of-danger finding (internal quotation marks omitted)).

completed parole on both his prior offenses. (Although he committed those offenses in 1999 and 2002, he was not arrested for the first until 2003 and the second until 2008— and he completed parole on both without incident.[18]) Mr. Shumpert's past success on parole, and the close supervision he would be under during home confinement, also counsel for his release.

Finally, the government argues that Mr. Shumpert is a danger because society is especially vulnerable to wrongdoing during the pandemic.[19] Specifically, it cites a news story about a website offering fake vaccine kits, and a warning from the Federal Deposit Insurance Corporation that "some people may take advantage of COVID-19" to perpetrate bank scams.[20] The government also speculates that a person previously convicted of a crime may be less likely to follow public-health guidelines upon release.[21] These generic assertions do not justify risking Mr. Shumpert's life despite what the government concedes are extraordinary and compelling reasons for his release.

### B. Length and harshness of time served and remaining 18 U.S.C. § 3553(a) factors favor a sentence reduction.

As Mr. Shumpert showed in his motion, other sentencing factors also support a reduction in his sentence.[22] These factors include that:

(1) Mr. Shumpert would likely have earned release by now if the pandemic had not disrupted BOP programming;

(2) He has already served 51% of his expected custodial sentence;[23]

(3) His incarceration conditions have been especially harsh—for example, he served 14 months in county jail (including seven months postsentencing), contracted COVID-19 in Santa Rita, and endured extended medical isolations and quarantines in punitive conditions;

---

[18] *See* Def.'s Sent. Mem. 8–9, Feb. 11, 2020, ECF No. 23.
[19] Opp'n 17–18.
[20] *Id.* 17.
[21] *Id.* 18.
[22] *See* Mot. 16–21.
[23] As of today, Mr. Shumpert has served 554 days of his expected 1,088-day sentence.

(4) He has not had access to rehabilitative programming;

(5) He would have access to addiction and gambling treatment upon release;

(6) He has employment waiting for him, which would facilitate his progress in making restitution payments.[24]

In opposition, the government argues that "[r]eleasing Shumpert outright would not appropriately rebalance the § 3553(a) factors in this case[.]"[25] But Mr. Shumpert is not asking for outright release; he is requesting a special term of supervised release—with all previously imposed supervision conditions as well as home confinement—to replace the remainder of his custodial sentence.[26] The government concedes that this Court has the authority to impose this alternative sentence.[27] During this pandemic, such punishment would be sufficient but not greater than necessary for Mr. Shumpert's offense.[28]

### III. Mr. Shumpert's life is in danger at FCI Lompoc.

The government's opposition does not dispute the disturbing conditions at FCI Lompoc described in recent reports by the Office of the Inspector General and by the court-appointed expert (Dr. Venters) in *Torres v. Milusnic*, C.D. Cal. No. 20-4450.[29] Instead, the government asserts that Mr. Shumpert is safe, because the "BOP has had a Pandemic Influenza Plan in place since 2012."[30] That plan has long been overtaken by events. In just the eight days since Mr. Shumpert filed his motion for compassionate release, *ten* more people died from COVID-19 in federal custody—a mortality rate higher than one person per day.[31] In the same period, the number of incarcerated

---

[24] *See* Mot. 16–21.
[25] Opp'n 20.
[26] *See* Mot. 19; *see also* Proposed Order Granting Compassionate Release, ECF No. 31-13.
[27] *See* Opp'n 20 & n.9.
[28] *See* 18 U.S.C. § 3553(a); *see also Davidson*, 2020 WL 4877255, at *22 (explaining that placing defendant on "supervised release status with the condition of home confinement for the remainder of his in-custody term" is "a very different situation . . . [from] simply being asked to fling open the doors to the prison and let [the defendant] walk out").
[29] *See* Mot. 8–12 (summarizing those reports); *see generally* Opp'n.
[30] Opp'n 12.
[31] *Compare COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited

people with confirmed positive tests increased by *more than a thousand*—from 5,994 to 7,093.[32] The BOP is unable to keep incarcerated people safe.

The active COVID-19 outbreak at the Lompoc complex (which includes FCI Lompoc, USP Lompoc, and two camps) is an immediate threat to Mr. Shumpert's life.[33] In the day since the government filed its opposition, four more incarcerated people there have tested positive.[34] And since Mr. Shumpert filed his motion, at least one more staff member also tested positive.[35] While the government asserts that the positive cases are at USP Lompoc rather than FCI Lompoc, this appears to be because everyone who tests positive for COVID-19 at FCI Lompoc is then transferred to USP Lompoc.[36] Dr. Venters's report revealed that "no medical isolation or medical quarantine was being conducted" at FCI Lompoc, and instead "quarantine and medical isolation[] occurred at USP Lompoc[.]"[37] Indeed, although the BOP reported a new death from COVID-19 at FCI Lompoc on Wednesday, December 16, 2020, there were officially zero confirmed cases of COVID-19 at FCI Lompoc the entire week of December 13-19, 2020.[38] Further, the number of positive individuals at the Lompoc complex is likely higher than the number of reported cases, because—incredibly—the complex appears not to be testing

---

December 29, 2020) (reporting "179 federal inmate deaths"), *with* Mot. 2 (BOP reporting 169 federal inmate deaths as of December 21, 2020).

[32] *Compare COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited December 29, 2020), *with* Mot. 2.

[33] *See* COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters 4 ¶ 10, *Torres v. Milusnic*, C.D. Cal. No. 20-4450, September 25, 2020, ECF No. 101-1 (Venters Report) (Comp. Release Mot, Parkman Decl., Ex. E) (defining the Lompoc complex).

[34] *Compare* Gov't Opp'n 14 (BOP reporting six positive inmates on December 28), *with COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited December 29, 2020) (BOP reporting 10 positive inmates).

[35] *Compare* Mot. 12 (BOP reporting three positive employees on December 21), *with* Opp'n 14 (four positive employees on December 28).

[36] *See* Opp'n 18.

[37] Venters Report 4–5 ¶ 12.

[38] *See Inmate at Lompoc Prison dies from COVID-19*, News Channel, December 16, 2020, https://keyt.com/news/top-stories/2020/12/16/inmate-at-the-lompoc-prison-dies-from-covid-19/; *see also Facility-Level BOP COVID-19 Trends*, Department of Justice Office of the Inspector General, https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_2/ (last visited December 29, 2020) (showing active COVID-19 cases over time at LOMPOC FCI).

its population.[39] As of today, the BOP's website shows *zero* pending tests for the incarcerated population at the Lompoc complex.[40] Confined in an open dormitory with 160 other people, crammed into beds about three feet apart, and denied COVID-19 testing, Mr. Shumpert's life is in danger at FCI Lompoc.[41]

## CONCLUSION

Mr. Shumpert's fraud conviction does not warrant the risk to his life at FCI Lompoc. This Court should therefore replace the remainder of his custodial sentence with a special term of supervised release requiring home confinement (as described in the proposed order submitted with his motion).

Dated:   December 29, 2020                    Respectfully submitted,

                                              STEVEN G. KALAR
                                              Federal Public Defender
                                              Northern District of California

                                               *s/ Jenya Parkman*
                                              JENYA PARKMAN
                                              Assistant Federal Public Defender

---

[39] *See United States v. Amarrah*, 458 F. Supp. 3d 611, 618 (E.D. Mich. 2020) (explaining that number of reported cases may be far lower than the actual number of cases because of lack of testing); *Schumack*, 2020 WL 4333526, at *3 ("[Z]ero confirmed COVID-19 cases is not the same thing as zero COVID-19 cases." (internal quotation marks and brackets omitted)).

[40] *See COVID-19 Inmate Test Information*, BOP, https://www.bop.gov/coronavirus/ (last visited December 29, 2020); *see also* Mot., Parkman Decl. 3 ¶ 2, ECF No. 35-1 (reporting Mr. Shumpert's statement that his housing "unit is not regularly testing its inhabitants for COVID-19").

[41] *See* Mot. Parkman Decl. 3 ¶ 2, ECF No. 35-1; *see also* Schumack, 2020 WL 4333526, at *4 (holding that "it would appear to be virtually impossible for Defendant to adequately protect himself against infection" when he is required to "sleep in a confined space" on "bunks [that] are mere feet away from each other[.]"); *United States v. Salvagno*, 456 F. Supp. 3d 420, 429 (N.D.N.Y. 2020) (granting release to defendant confined in a prison whose "internal architecture inhibits social distancing").